UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LINCOLN ROCK, LLC,

      Plaintiff,

                                    CASE NO.: 8:15-CV-01374-JSM-JSS

v.

CITY OF TAMPA,

      Defendant.

_____/

**DEFENDANT'S DAUBERT MOTION TO EXCLUDE
OPINION TESTIMONY OF PLAINTIFF'S ECONOMIC EXPERT
HENRY H. FISHKIND, PHD AND INCORPORATED MEMORANDUM OF LAW**

      The Defendant, City of Tampa ("City"), by and through its undersigned counsel, pursuant to Fed. R. Evid. 702 and applicable law, hereby moves this court for entry of an Order excluding the opinion testimony of Plaintiff's expert economist, Henry H. Fishkind, PhD, and as grounds therefore would state as follows:

      1.      This is an action by the Plaintiff, Lincoln Rock, LLC ("Lincoln Rock"), against the Defendant, City of Tampa, for alleged violations of the Fair Housing Act ("FHA") and the Americans with Disabilities Act "(ADA") arising out of the City's denial of a Special Use II permit to allow Lincoln Rock to operate a residential treatment facility ("RTF") for alcohol and drug addicts in West Tampa.

      2.      Plaintiff served the Rule 26 disclosure of its expert economist, Dr. Henry H. Fishkind, on April 18, 2016.[1] The approach used by Dr. Fishkind to determine the damages Lincoln Rock allegedly sustained is arbitrary, fundamentally flawed, and not based on any

---

[1] A copy of the Initial Expert Report of Henry H. Fishkind, Ph.D (4/18/2016) is attached as Exhibit "1".

reliable methodology. Further, Dr. Fishkind's opinion is based on unsupported speculative leaps and assumptions with no underlying factual support or rationale; fails to correctly apply his own flawed methodology to the facts of this case; contains glaring mistakes; and fails to include significant factors in his damages methodology, including the costs Plaintiff saved as a result of not opening up the proposed residential treatment facility.  Finally, the opinion reached is not an "expert" opinion as it is based upon a single mathematical calculation within the capability of the ordinary juror.

3.     Significantly, Plaintiff served a "supplemental"[2]  report of Dr. Fishkind[3] on the last day of discovery wherein Dr. Fishkind changed his methodology in response to factual errors and lapses in logic identified in the expert report of Defendant's expert economist, Dr. Stephen E. Durham, in his Rule 26 Expert Disclosure. In his new opinion, Dr. Fishkind acknowledges some of the significant flaws in his methodology and changes his opinion on damages by $1,419,282.00.[4]  However, Dr. Fishkind's new opinion suffers from the same fatal deficiencies as does his initial opinion.

4.     For the reasons stated above, the City moves this court for an Order excluding Dr. Fishkind from offering any testimony or opinion in this case.

## LAW ON DAUBERT AND FED. R. EVID. 702

5.     The admissibility of expert testimony is governed by Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

---

[2] The alleged "supplemental" report is anything but.  It is actually a brand new report with a new, equally flawed methodology that the City has moved separately to strike for the reasons expressed in this motion and for additional reasons.  (Doc. 44)
[3] A copy of Plaintiff's Supplemental Rule 26 Expert Disclosure of Dr. Henry H. Fishkind (8/29/2016) is attached as Exhibit "2".
[4] Initial Expert Report of Henry H. Fishkind, Ph.D (4/18/2016) at ¶17.0.

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702

6.      Fed. R. Evid. 702 is a codification of the landmark case of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendments. In Daubert, the U.S. Supreme Court described the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." Id at 589. "The trial judge must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id at 591; see also, United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir.2004) ("The district court's role is especially significant since the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it. Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case").

7.      In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Court clarified that the requirements under Daubert apply to any expert offering opinions based on scientific knowledge, technical or other specialized knowledge. Id. at 147-148. The principles articulated in Daubert and its progeny apply to expert witness testimony offered by economists and other financial experts. See, Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001) (evaluating the admissibility of an expert economist's opinion under Daubert); Club Car, Inc. v. Club Car (Quebec) Imp., Inc., 362 F.3d 775, 780 (11th Cir. 2004) (applying Daubert when determining admissibility of expert testimony of accountant).

8.    The Eleventh Circuit, emphasizing the importance of the district court's gate-keeping function under Daubert and Kumho Tire, noted:

> The importance of Daubert's gate-keeping requirement cannot be overstated. As the Supreme Court framed it in Kumho Tire: "[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal citations omitted).

9.    The trial court must perform this gate-keeping function to "ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005), quoting, McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002). In doing so, the trial court ensures that the expert employs "in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the relevant field." Kuhmo Tire, 526 U.S. at 152.

10.   The district court is afforded broad discretion in deciding Daubert issues and a ruling on admissibility will only be disturbed if it is "manifestly erroneous". Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003). When determining if expert testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bear on the opinion's validity and the court finds useful. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). These particular factors will depend upon the unique circumstances of the expert testimony involved. Id.

11.   In Rink v. Cheminova, Inc., the Eleventh Circuit set forth a three-pronged approach to qualifying expert witnesses. 400 F.3d at 1291-1292. To fulfill its obligation under Daubert, district courts must engage in a rigorous inquiry to determine whether: (1) the expert is

qualified to testify competently regarding the matters they intend to address; (2) the methodology by which the expert reaches their conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. <u>Rink</u>, 400 F.3d at 1291-1292 (internal citations omitted).

12.     The party offering an expert has the burden of satisfying each of these elements by a preponderance of the evidence. <u>Rink</u>, 400 F.3d at 1292; *see also*, <u>Allison v. McGhan Med. Corp.</u>, 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence"). The party offering an expert must show that the expert has sufficient expertise to choose and apply a methodology, that the methodology was reliable, that sufficient facts and data as required by the methodology were used, and that the methodology was otherwise reliably applied. <u>Daubert</u>, 509 U.S. at 595. The burden on the party offering the expert is therefore substantial. <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.</u>, 402 F.3d 1092, 1107 (11th Cir. 2005).

## I.     THE METHODOLOGY USED BY DR. FISKIND IS ARBITRARY, FUNDAMENTALLY FLAWED, AND UNRELIABLE.

13.     In his initial report, Dr. Fishkind utilized a valuation methodology limited solely to the opportunity Plaintiff allegedly lost to develop and operate a residential treatment facility.[5] Dr. Fishkind specifically <u>rejected</u> a damages calculation based on lost profits as too speculative:

> The third and most difficult question is whether the proposed RTF could have earned profits that can be measured to a reasonable degree of economic certainty. As noted above, the Plaintiff had no experience operating an RTF.
>                                     …
> Given these facts, I decided not to quantify the Plaintiff's damages based on the potential profitability of the RTF as the Plaintiff had planned. Instead, I valued the

---

[5] Initial Expert Report of Henry H. Fishkind, Ph.D (4/18/2016) at ¶19.0.

damages based on the market value of the licensed beds that the Plaintiff reasonably expected to be approved.[6]

14.     Dr. Fishkind passed on one speculative valuation methodology and chose instead an even more speculative one.  Instead of using a lost profits analysis, Dr. Fishkind came up with a "comparable sales" approach common in the real estate appraisal industry to value Lincoln Rock's RTF.  However, Dr. Fishkind's "comparable sales" methodology is based on a single criterion – the acquisition costs that a $4-billion-dollar international healthcare conglomerate, Acadia Healthcare[7], incurred for the purchase of U.S. residential treatment facilities with 100 beds or fewer from 2013-2015.[8] Dr. Fishkind arbitrarily selects this subset without including any factors that would assure that the residential treatment facilities in this subset demonstrate some reliable indicia of comparability with each other.  His methodology is fatally flawed because the residential treatment facilities in his arbitrarily selected subset are wildly disparate; are in no way comparable to the Lincoln Rock facility (which never opened its doors for business); and constitute a misleading and unreliable predictor of the appraised value of Lincoln Rock.

15.     In his initial report, Dr. Fishkind noted that Acadia completed 19 acquisitions of residential treatment facilities since 2013.[9] After subtracting the acquisitions in the United Kingdom and two (2) acquisitions of "major" healthcare systems (consisting of 1200 and 2400 beds, respectively), Dr. Fishkind opined that the appropriate comparator to Lincoln Rock is *any* U.S. facility acquired by Acadia with 100 beds or fewer:

---

[6] Id. at ¶23.0 - 24.0.
[7] Acadia Healthcare has market capitalization of $4-billion. *See*, U.S. Securities and Exchange Commission, Form 10-K of Acadia Healthcare Company, Inc. (dated 2/26/2016) at p. 2 ("As of June 30, 2015, the aggregate market value of the shares of common stock of the registrant held by non-affiliates was approximately $4.0 billion"). The entire Form 10-K is not attached but available at http://www.acadiahealthcare.com/investors/sec-filings.
[8] Initial Expert Report of Dr. Henry H. Fishkind (4/18/2016) at ¶25.0 – 32.0.
[9] Id. at ¶28.0.

[T]he RTF at issue here is relatively small at 21 licensed beds. Therefore, it is most appropriate to estimate its value based on the subset of transactions that only include U.S. facilities with fewer than 100 beds.[10]

16.     There is no data point, research document, analysis, fact-finding, or investigation materials offered to support this completely random selection criteria.

17.     From this subset of facilities with 100 or fewer beds, Dr. Fishkind then multiplies the amount Acadia paid per bed for these U.S. residential treatment facilities; takes the average of that amount; and then somehow extrapolates that the per-bed value for the Lincoln Rock facility is equal to that average value, which comes to $236,998.00. The sum total of Dr. Fishkind's purported "methodology" and his work on this case amounts to creating a random list of 19 acquisitions by Acadia Healthcare, reducing it to those U.S. facilities with 100 beds or fewer, and performing basic arithmetic.  This does not rise to the level of an expert opinion because it requires no specialized expertise, as basic arithmetic is within the ability of the common juror.

18.     Dr. Fishkind's methodology values Lincoln Rock based on a *single* arbitrary criterion – the average per-bed value of U.S. residential treatment facilities that have 100-beds or fewer. This methodology is akin to using the average price per room of all 100-room or fewer hotels to value a small Motel 6 facility by taking the average of the price per-room of The Ritz Carlton, the Hilton, and the Motel 6. Dr. Fishkind's methodology overly simplifies a complex valuation process by ignoring huge differences in quality, services, and value among the facilities contained within Dr. Fishkind's randomly selected subset.  Clearly, a Motel 6 is not a Ritz Carlton, but Dr. Fishkind is eager to have the opportunity to convince the jury that this mirage is in fact real.

---

[10] Id. at ¶31.0.

19.     By using this random and unsupported methodology, Dr. Fishkind selected comparators with anywhere from 28-87 beds with <u>no</u> analysis of the services offered by these facilities; the underlying value of the real property where the facilities were situated; whether the facilities were profitable and for how long; the daily rates charged by these facilities versus the daily rates Lincoln Rock planned to charge; and the length of time the facilities were in business.

20.     The simple fact is that the comparator with the closest number of beds to the Plaintiff's proposed facility is Skyway with 28 beds. Instead of concentrating his analysis on the similarities between Skyway and Lincoln Rock, Dr. Fishkind inexplicably chose to take the *average* acquisition price of *all* acquisitions with between 28-87 beds to come up with a market value for Lincoln Rock's proposed facility. This random assumption allowed him to increase his appraisal from the $10,714.00 per-bed sales price of 28-bed Skyway, to a market value for Lincoln Rock based on the $236,998.00 per-bed average sales price of 8 facilities entirely inapposite to Lincoln Rock. This is despite the fact that all but one of the facilities are much larger than *twice* the size of Plaintiff's proposed facility. Dr. Fishkind's opinion of $236,998.00 per-bed is based upon a fundamentally and fatally flawed analysis by assuming that *any* facility with fewer than 100 beds must have the same per-bed value, regardless of the services offered; its geographical location; the fees charged; and the financial track record of the facility.

21.     For instance, one of the comparators used by Dr. Fishkind is the 68-bed facility Pacific Grove Hospital in Riverside, California. Pacific Grove is located on a 4.5-acre campus with three (3) separate treatment units for medical detoxification, psychiatric services, and partial hospitalization including "self-contained…private courtyards, laundry facilities, patient lounges and semi-private rooms."[11] Pacific Grove offers treatment programs for chemical dependency,

---

[11] www.pacificgrovehospital.com/about.

psychiatric, outpatient, and a family program.[12] In comparison, the 21-bed facility proposed by Plaintiff was to be located on 0.63-acres[13] in West Tampa in a 8,905-square-foot building[14] in which patients would be lodged three-to-a-room. The services were limited to residential treatment for alcohol and drug addiction and dual-diagnosis disorders.[15] As the facility proposed by Lincoln Rock was severely limited in space, there were no patient lounges or laundry facilities planned, and the only space suitable for large group meetings was an open courtyard in the interior of the property exposed to the elements.[16] The price per-bed that Acadia Healthcare paid for Pacific Grove was $154,412.00, yet Dr. Fishkind opined the price per-bed for Plaintiff's proposed facility would be $236,998.00.[17]

22.     As the example above makes clear, applying Dr. Fishkind's rudimentary methodology based on the single criterion of the cost per-bed of a list of 100 bed or fewer U.S. residential treatment facilities will always yield a numerical value - just as any arithmetic calculation and a calculator will yield a numerical value. The problem with Dr. Fishkind's methodology however is that it will yield wildly unreliable values because the *only* criterion is 100 beds or fewer.  Dr. Fishkind's methodology cannot be applied reliably to the facts of the case.  Using Dr. Fishkind's scheme, a proponent of a particular valuation can skew the results any way the proponent wishes. For example, applying Dr. Fishkind's methodology to determine the value of a 30-room Motel 6 would result in significant value when averaged with eight (8)

---

[12] Id.

[13] Hillsborough County City-County Planning Commission Petition V13-61 at p. 1 attached as Exhibit "3."

[14] Id. at p 2.

[15] Plaintiff planned to offer treatment for dual-diagnosis disorders although the primary focus was treatment for alcohol and drug addiction. Eric Kaplan 6/10/2016 depo. 51:8-52:20 (dual-diagnosis); 122:15-123:12 (explaining dual-diagnosis). Excerpts attached as composite Exhibit. "4."  Thomas Lamb 7/13/2016 depo. 52:6-52:10 (3-patients per room). Excerpts attached as composite Exhibit "5";

[16] Jacki Krone 7/22/2016 depo. 73:10-73:14 (a laundry service would be required for Lincoln Rock); Jacki Krone 7/22/2016 depo. 89:3-89:11 (morning reflection and meditation would take place in the outdoor courtyard). Excerpts attached as composite Exhibit "6."

[17] Initial Expert Report of Dr. Henry H. Fishkind (4/18/2016) at ¶18.0

Ritz Carltons and Hiltons with fewer than 100 rooms. However, when the comparators used are other hotels with similar characteristics to a Motel 6 that accommodate budget-minded travelers, the value per room becomes drastically different. Such a wildly disparate result is precisely why a district court is required to undertake with the "rigorous" task of testing the reliability of an expert's proposed methodology. Rink, 400 F.3d at 1291-1292.

23.     The City contends that for a methodology utilizing the average acquisition cost of comparators to be reliable, the methodology must include, at a minimum, more than just the single arbitrary criterion of U.S. residential treatment facilities with a certain number of beds.[18] For instance, the comparators should include those residential treatment facilities of similar size with similar services and amenities offered; located in a comparable geographic location; charging comparable fees and accepting comparable types of insurances; and demonstrating comparable future profit margin projections. *See e.g.,* Lippe v. Bairnco Corp., 288 B.R. 678, 693 (S.D.N.Y. 2003), aff'd, 99 F. App'x 274 (2d Cir. 2004) (factors that should be considered when comparing companies for the purposes of a business valuation include such things as product and geographic markets, size, growth rates, profit margins, and other industry and economic considerations). One example of the disparity in services provided by Lincoln Rock and Dr. Fishkind's comparators is that the latter all provide outpatient services, an important feature of any RTF, while Lincoln Rock did not.[19]  Dr. Fishkind simply chose to ignore that.

24.     Dr. Fishkind's methodology comes down to a 3rd grade arithmetic exercise with no indicia of reliability. He creates a list and performs simple arithmetic. The rigorous gate-

---

[18] Defendant does not remotely suggest that Dr. Fishkind's arbitrary selection of the criterion of 100-beds or fewer is in any way reliable, even as a starting point, for valuing residential treatment facilities. Indeed, a 100-bed facility would be nearly 5-times the size of the facility Lincoln Rock proposed.
[19] Expert Report of Stephen E. Durham, PhD (6/15/2016) at p. 4. (Attached as Exhibit "7.")

keeping function required by <u>Daubert</u> and its progeny demand more from an expert offering an opinion in federal court. <i>See</i>, <u>Rink</u>, 400 F.3d at 1291-1292.

25.     When assessing the reliability element of <u>Daubert</u>, trial courts must determine "whether the reasoning or methodology underlying the testimony is...valid and whether that reasoning or methodology properly can be applied to the facts in issue." <u>Frazier</u>, 387 F.3d at 1262 (quoting <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592–93 (1993)) (internal citations omitted). Expert opinion testimony connected to pertinent data only by the <i>ipse dixit</i> of the expert is inadmissible under <u>Daubert</u> and Fed. R. Evid. 702. <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997). In such cases, the district court may conclude there is too much of an analytical gap between the data and the opinion offered by the expert. <u>Id</u>. "[T]he task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." <u>In re Scrap Metal Antitrust Litigation</u>, 527 F.3d 517, 529-530 (6th Cir. 2008).  Dr. Fishkind's methodology and opinions can be summed up in these two words – "unsupported speculation."

26.     In <u>Kipperman v. Onex Corp.</u>, the district court excluded the testimony of an expert economist based on a determination that the expert's methodology was unreliable under <u>Daubert</u>. 411 B.R. 805, 847 (N.D. Ga. 2009). The expert used a three-year average historical growth rate to determine the value for a company. <u>Id</u>. at 846. The expert testified that a three-year average was "conservative", and when questioned about his use of a three-year average, the expert testified as follows:

Q     Why didn't you use a 2–year historical average?
A     Two years, you know, it's like prunes, six is too many, three is too few. In my looking at the data, it seemed that a 3–year average would, took away—I mean,

they had a bad year in there, they had two good years in there, and I thought this would be a pretty good estimate of what would happen going forward.

Q    Why didn't you use a 4–year average?

A    The 4–year average would have—I forget what that earliest year was, but that was coming out of the IPO, and it would have—I don't remember what the number was—but I took a number that seemed to be, you know, consistent with the construction industry, the MBA forecasts which I think was 6.3 percent, which is a little bit higher. I mean, every other forecast that we've seen suggests the company is going to grow around the rate of the economy-even your experts when they do their Gordon growth model assume that the company will grow at either 3 percent or 4 percent. They don't have these astronomical growth rates embedded there. In my sense, I thought 3 years was just right. Id. at 846–47.

The district court noted there was no rationale why the three-year average was "just right". Id. at 847. The expert's use of a three-year growth rate instead of a two, four, or five-year growth rate resulted in a significant change in valuation. Id. Excluding the expert's opinion based on a flawed methodology under Daubert, the district court noted:

> When an expert testifies that he is providing a "conservative estimate" but he provides no principled model or methodology from which that estimate was produced, his testimony is pure *ipse dixit*. An expert who applies a principled model but uses unprincipled variables in that model is akin to a magician who creates a distraction so the audience cannot see what he is really doing. Id at 848.

27.    The Kipperman decision could have been written substituting Dr. Fishkind's name for the economist excluded by the Kipperman court pursuant to Daubert. Like this economist, Dr. Fishkind employed the "Goldilocks Method" to select the three year time period over which to do his calculations. No reasoning or data was provided by either economist as to why they selected three years (as opposed to two or four years) except that two years was too little, four was too much, and three was … "just right."[20]

28.    Dr. Fishkind's methodology also utilizes the Goldilocks Method in another way. He selects the 3-year period following Lincoln Rock's permit application hearing to collate "comparable sales" information, but why then? Why not utilize the three year period before the

---

[20] Robert Southey, *Goldilocks and the Three Bears*, 1837.

permit was denied?  Or why not collect information from both <u>before</u> and <u>after</u> the permit

hearing?  Again Dr. Fishkind offers up not a word to justify his selection of <u>these</u> <u>three</u> years,

except the "sense" that they are, like the Baby Bear's bed, "just right."[21]

29.     This district court in the instant case struck the opinion of a forensic accountant

when he attempted to perform a business valuation of a long-term care facility:

> [Defendant's expert] Mr. Buttner does not have any background information on
> the long term care insurance industry. He has done no work in the long term care
> industry in the last ten years. He did no research or analysis of the long term care
> market for this case. He only read some articles his staff pulled from the internet
> and does not know what searches his staff performed to come up with those
> particular articles. The articles totaled about fifteen pages of internet research.
> None of that research compared Plaintiff's business to sales of other like
> businesses. Mr. Buttner's report does not discuss the three approaches (assets-
> based, market, and income) and how they relate specifically to Plaintiff's
> business. He does not discuss the various factors that a business valuator should
> consider as they relate to weighting the three approaches in the valuation. He only
> calculates future income, based on certain assumptions, and then reduces that
> figure to present value. That is insufficient to support the valuation of a business
> <u>Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.</u>, 254 F. Supp. 2d 1239, 1245
> (M.D. Fla. 2003).

30.     It's difficult to characterize accurately the valuation method Dr. Fishkind has

undertaken as his methodology does not include any appreciation for the numerous factors that

go into a comparable sales damages model other than the single criterion of American facilities

with 100 beds or fewer. Indeed, Dr. Fishkind insists that his opinion is of "damages", when what

he is really offering is an opinion on the market value (appraisal) of Lincoln Rock.  Another huge

"gap" in Dr. Fishkind's method is his failure to fix the **<u>date</u>** of the market value anywhere in his

report. This is a critical assumption that must be carefully considered by any valuation or

appraisal expert as varying the date of the valuation/appraisal - by even a single week - can

drastically change the valuation amount due to quickly changing market conditions.  The fact

that Dr. Fishkind was unaware of this essential valuation principle, or (even worse) that he was

---

[21] <u>Id</u>.

aware of it but chose to ignore it, leaves a gaping hole in his methodology that renders his opinion on the fair market value of Lincoln Rock's theoretical facility useless. The conclusions that Dr. Fishkind arrives at with respect to the comparators (and therefore the damages and/or market value of Lincoln Rock) demonstrate the fallacy of his methodology. *See*, <u>Gen. Elec.</u>, 522 U.S. at 146 (conclusions and methodology are not necessarily distinct from one another and therefore a challenge to either can establish a viable challenge under <u>Daubert</u>).

31.     Dr. Fishkind has admitted that a lost profits analysis was too speculative based on the infancy of Lincoln Rock. However, Dr. Fishkind's alternative methodology is simply to determine that a comparator to Lincoln Rock is a residential treatment facility with 100 beds or fewer. His selection of this single criterion fails to satisfy the reliable methodology requirement of <u>Daubert</u> as it is without any rationale or justification. *See*, <u>Kipperman,</u> 411 B.R. at 847, *see also*, <u>Loeffel Steel Prod., Inc. v. Delta Brands, Inc.</u>, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) (opinion of business valuation expert not reliable under <u>Daubert</u> when the comparator businesses he used for lost profits analysis were not comparable). Dr. Fishkind's opinion is therefore not based on any reliable methodology and should be excluded by this court.

## II.   DR. FISHKIND'S METHODOLGY IS BASED ON UNSUPPORTED SPECULATIVE LEAPS AND ASSUMPTIONS WITH NO UNDERLYING RATIONALE.

32.     As previously noted, Dr, Fishkind admits that a lost profits analysis is speculative and thus he opts for what appears to be a "comparable sales" methodology.  There is a serious flaw in the logic of this approach.  In order to apply the "comparable sales" approach, Dr. Fishkind has to make huge unsupported speculative leaps.  He must assume (without a shred of support) that Lincoln Rock would have opened its doors; it would have survived the critical time after opening by drawing patients; it would have generated enough revenue to survive; it would

have had access to significant capital to pay operating expenses and remain solvent until profitability; it would have developed those traits (such as consistent, sustained profit margins) that made it an appealing acquisition target for Acadia; and that it would have been able to come to a sales agreement with Acadia. Like a long row of dominoes stacked closely together, if only one of these wildly speculative assumptions falls, then the entire row comes tumbling down. While he admits that lost profits cannot be calculated "within reasonable economic certainty", he adopts an even more speculative methodology that sees several years into the future and imagines Lincoln Rock as a viable engine of economic activity, even though it had never even opened for one day.[22]

33.     Another significant assumption that underlies Dr. Fishkind's conclusion that Lincoln Rock would become a viable and profitable residential treatment facility is that Lincoln Rock had the financial wherewithal to complete the build-out of the facility; obtain all the appropriate licensing and approvals to operate; adequately staff  and train employees; open the facility; consistently attract patients to pay $30,000.00 per month for treatment[23]; and successfully operate the business for a sufficient length of time until it generated profits and established a track record wherein an international healthcare conglomerate may be interested in purchasing the facility.

34.     Indeed, Dr. Fishkind concedes that at the time Lincoln Rock's application for a permit was denied, Lincoln Rock had only acquired the property, prepared a business plan, identified certain staff, and prepared an operating manual.[24] He acknowledges that the principle

---

[22] Dr. Fishkind's experience as a prognosticator of future economic events includes his opinion that the downturn in the housing market would not deteriorate further after May 2007. *See*, "Economist Sees Daylight in the Housing Market", Sarasota Herald Tribune, May 18, 2007, attached as Exhibit "8".
[23] Lincoln Rock planned to charge patients $30,000.00 per month. Jacki Krone 7/22/2015 depo. 124:3-124:13. Depo excerpts attached as composite Exhibit "6."
[24] Initial Expert Report of Henry H. Fishkind, Ph.D (4/18/2016) at ¶22.0.

of Lincoln Rock had no experience operating a residential treatment facility.[25] Dr. Fishkind's assumption that Lincoln Rock could sustain losses until it achieved profitability was based entirely on the following:

> The Plaintiff had the capital needed to convert the Property into the RTF. The Plaintiff had assembled the professional staff needed to operate the RTF and they had developed the operating procedures and policies in anticipation of operating the RTF.[26]
>
> …
>
> [T]he Plaintiff purchased the Property. This demonstrates the Plaintiff's capacity to finance the RTF.[27]

35.     The latter "conclusion" constitutes a huge leap.  He reasons that because Lincoln Rock ***purchased*** a parcel of property, that it must therefore have the financial wherewithal to ***sustain*** a fully functioning residential treatment facility until it achieves profitability. He blithely asserts without any support that Lincoln Rock could "convert the property into the RTF", but he has no data to back up this assertion (notwithstanding that converting the property to a RTF and operating it until profitability are distinctly separate activities). There is no indication in Dr. Fishkind's reports that he ever reviewed or analyzed any data to confirm that Lincoln Rock could financially sustain their enterprise until profitability. His assumption is based entirely on the fact that Lincoln Rock had purchased a parcel of property. Such assumptions are the types of deficient analysis routinely rejected by the district courts. *See*, <u>ZF Meritor LLC v. Eaton Corp.</u>, 646 F. Supp. 2d 663, 667 (D. Del. 2009), <u>aff'd</u>, 696 F.3d 254 (3d Cir. 2012) (excluding expert economist, in part, because the expert relied on unverified financial data without knowing the qualifications of those that prepared it or its validity); <u>Ellipsis, Inc. v. The Color Works, Inc.</u>, 428

---

[25] Id. at ¶22.0.
[26] Id. at ¶14.0.
[27] Id. at ¶21.0.

F. Supp. 2d 752, 760 (W.D. Tenn. 2006) (excluding expert testimony because the expert relied exclusively on data provided by the plaintiff"); Children's Broadcast Corp. v. Walt Disney Co., 245 F.3d 1008, 1018, 1022 (8th Cir. 2001) (excluding expert testimony because the expert ignored relevant evidence that was less favorable to the client); O'Conner v. Commonwealth Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994) (subjective belief or unsupported speculation of expert fails the reliability prong of Daubert).

36.     Plaintiff will no doubt argue that Dr. Fishkind's inability to value Lincoln Rock as a fully operational and profitable residential treatment facility resulted from the alleged discriminatory action of the City Council when they denied Lincoln Rock's application for a special use permit. Notwithstanding the hotly disputed issues of liability in this case, the City contends that this does not somehow obviate the requirement for the rigorous analysis required by Daubert. For Dr. Fishkind's opinion to be admissible, he is required to offer a reliable methodology based on solid foundational principles. Kumho Tire, 526 U.S. at 141.

37.     Instead, Dr. Fishkind simply makes an analytical leap to imagine Lincoln Rock years into the future as a fully operational and profitable residential treatment facility about to be acquired by an international healthcare conglomerate. The significant hurdle to the admissibility of Dr. Fishkind's opinion is not any allegedly discriminatory act on the part of the City – it's the fact Dr. Fishkind chose to use a fundamentally flawed methodology based on unsupported speculative leaps and assumptions with no underlying rationale.

38.     While an expert is permitted to extrapolate from existing data, an expert is not permitted to over-extrapolate to reach unsupported conclusions. Gen. Elec., 522 U.S. at 146 (expert's opinion properly excluded wherein expert extrapolated from animal studies that certain agents caused cancer in plaintiff). In his opinion, Dr. Fishkind extrapolates from the purchase of

a parcel of property and the development of a business plan to a fully functioning and profitable residential treatment facility valued at $4,976,956.00.[28] Performing this analytical leap nets the Plaintiff a windfall of more than 7-times the price it paid for Lincoln Rock's property in less than 15-months.[29] Such an analytical jump is precisely the type of flawed methodology prohibited under Daubert.  Gen. Elec., 522 U.S. at 146.

## III.   DR. FISHKIND INCORRECTLY APPLIED HIS OWN FAILED METHODOLOGY TO THE FACTS OF THIS CASE AND ASSUMES FACTS THAT ARE DIRECTLY CONTRADICTED BY THE PLAINTIFF.

39.     An important assumption underlying Dr. Fishkind's methodology is that there is a significant market for the sale of residential treatment facilities and this market will "grow strongly" over the coming years because of the passage of the Affordable Care Act ("ACA"). Indeed, Dr. Fishkind opined that the expansion of insurance coverage will increase spending on alcohol and drug treatment "dramatically":

> [T]he expansion of insurance coverage is widely expected to increase spending on treatment dramatically. HHS projects that an additional 62 million Americans will be covered by insurance for substance abuse treatments…with an additional 62 million receiving insurance coverage the demand for treatment services will certainly increase.[30]

40.     Dr. Fishkind then makes a curious argument that because of the passage of the ACA, there will be a significant **_negative_** impact on smaller providers of alcohol and drug treatment facilities that only accept self-pay clients (precisely the patient profile Lincoln Rock was pursuing):

> Finally, the ACA is expected to change the structure of the provider industry, **_changes which favor larger providers such as the Plaintiff, and also support the_**

---

[28] Id. at ¶18.0.

[29] Lincoln Rock purchased the property for $625,000.00. See, Settlement Statement dated 4/17/2012 attached as Exhibit "9" and produced in response to Defendant's First Request for Production; See, Closing and Disbursement Statement dated 3/3/2015 attached as Exhibit "10" and produced in response to Defendant City of Tampa's First Request for Production.

[30] Initial Expert Report of Henry H. Fishkind, Ph.D (4/18/2016) at ¶47.0.

*Plaintiff's proposed acquisition of the Property. Marketdata argues that **the ACA will erode the competitive position of small providers, those with 40-beds or less. The requirements to meet new insurance standards and the inevitable impacts of cost controls are expected to particularly affect the smaller players in Tampa Bay.** "**These are the ones that are reliant on the Florida Model and are unable, or unwilling, or fail to adapt, as they shift to all cash payment and attempt to compete against much larger entities** like Elements Behavioral and Bain Capital's CRC Health Corp."*[31]

41.     On the one hand Dr. Fishkind cites to insurance trends that seem <u>favorable</u> to Lincoln Rock's future operations; but on the other hand he provides sobering news that small RTF's (fewer than 40 beds) like Lincoln Rock can expect to have their competitive position <u>eroded</u> by the ACA.  As Dr. Fishkind notes, the "***ACA will erode the competitive position of small providers, those with 40-beds or less…which will particularly affect the smaller players in Tampa Bay***." The Lincoln Rock facility was developed to be one of these "small providers", as it was expected to offer 18-21-beds:

> Q.     How many residents did you plan to put into the bedrooms?
>
> A.     We were -- we were planning to have three beds in each of the seven bedrooms for a total capacity of 21. We were envisioning having a structure that would allow single, double, or triple occupancy and rates that would be established to support that. And so at any given time, I think -- I would have to go back and look at what our -- what we thought our average occupancy might have been, but it was something in the high teens, I suppose, mid to high teens, in terms of what our average might have been.[32]

42.     Dr. Fishkind points out that those "small providers" that accept "all cash payment" will increasingly be unable to compete against the larger providers. Significantly, as Lincoln Rock's principal Bernard Rock testified, the business model of Lincoln Rock was based on <u>not</u> accepting insurance and relying <u>entirely</u> on "all cash payment" for patients' $30,000.00

---

[31] <u>Id</u>. at ¶49.0. (emphasis added) (internal footnotes omitted).
[32] Bernard Rock 6/21/206 depo. 49:25-50:11. See also, Bernard Rock 6/21/206 depo. 146:19-149:25 (the "revenue forecast" for Lincoln Rock was 18-beds).  Depo excerpts attached as composite Exhibit "11."

monthly stay at Lincoln Rock:

> Q.   Did you plan to accept insurance at Lincoln Rock?
>
> A.   Oh. No, I did not.
>
> Q.   It was all cash?
>
> A.   Correct.[33]

43.   If an expert fails to apply his own methodology when forming his opinion, the expert's opinion is sufficiently unreliable under <u>Daubert</u>. *See*, <u>In re Live Concert Antitrust Litig.</u>, 863 F. Supp. 2d 966, 994 (C.D. Cal. 2012) (economist excluded when he failed to properly apply his own methodology of statistical damages analysis); <u>Kilpatrick v. Breg, Inc.</u>, 613 F.3d 1329, 1343 (11th Cir. 2010) (expert physician ignored one factor of differential diagnosis methodology and was therefore properly excluded for failing to reliably apply his own methodology). Expert testimony that relies on unsubstantiated factual assertions is inadmissible. <u>Moore v. Int'l Paint, L.L.C.</u>, 547 F. App'x 513, 515 (5th Cir. 2013) (expert opinion inadmissible when opinion clearly contradicted by the record).

44.   One of the significant foundations of Dr. Fishkind's conclusion that Lincoln Rock is appropriately valued at $4,976,956.00 is his conclusion that the Affordable Care Act will have a significant impact on the market for alcohol and drug treatment. However, the factors that Dr. Fishkind identifies as driving forces in the industry will, by his own opinion, have a significant *negative impact* on Lincoln Rock. Remarkably, Dr. Fishkind's methodology flies in the face of Plaintiff's business model instead of supporting it.  His damages opinion is undermined by his own research.   Accordingly, both the methodology and the opinion are unreliable and inadmissible under <u>Daubert</u> and its progeny.

---

[33] Bernard Rock 6/21/206 depo. 184:2-184:9. Depo excerpts attached as composite Exhibit "11."

**IV.   DR. FISHKIND'S DAMAGES ANALYSIS FAILS TO INCLUDE ANY DEDUCTION FOR THE MONIES SAVED BY PLAINTIFF AS A CONSEQUENCE OF NOT OPENING A RESIDENTIAL TREATMENT FACILITY AND IS THEREFORE UNRELIABLE.**

45.   While Dr. Fishkind opined that the market value of the proposed Lincoln Rock facility (which he equates to the damages Plaintiff sustained) was $4,976,956.00[34], he failed to deduct from these damages significant costs Plaintiff saved as result of *not* opening a residential treatment facility and operating it until it became profitable. Dr. Fishkind further failed to deduct from the damages the sizable profit Plaintiff realized when it sold its land and building in June of 2015.[35]

46.   Even if the City Council had approved Lincoln Rock's permit to operate a residential treatment facility, the testimony of the Plaintiff's own witnesses confirmed it may have been six (6) months before it ever opened:

> Q:   Mr. Lamb, could you tell us how long after the hearing you would have opened the facility if you had received the permit?
>
> A:   Well, then we had to go through our remodel improvements. Jackie, Althea, and Eric needed to finalize the documents for the program beyond what the licensing required, you know, our internal working plan. I would imagine we would have been open for business, all things considered, six months, within six months.[36]

47.   Although Bernard Rock, the principle of Lincoln Rock, had no experience owning or operating a residential treatment facility, he anticipated Lincoln Rock would reach

---

[34] Initial Expert Report of Henry H. Fishkind, Ph.D (4/18/2016) at ¶18.0.

[35] Lincoln Rock purchased the property for $625,000.00. *See*, Settlement Statement dated 4/17/2012 attached as Exhibit "9" and produced in response to Defendant's First Request for Production; After the Tampa City Council denied the permit, Plaintiff sold both properties for $1,000,000.00. *See*, Closing and Disbursement Statement dated 3/3/2015 attached as Exhibit "10" and produced in response to Defendant City of Tampa's First Request for Production.

[36] Thomas Lamb 7/13/2016 depo. 108:18-109:1. Depo excerpts attached as composite Exhibit "5." Thomas Lamb's involvement in the project was equal to the involvement of the principle, Bernard Rock. 109:5-109:16. Depo excerpts attached as composite Exhibit "5."

profitability 9-months after opening.[37] Mr. Rock anticipated that costs to hire employees and operate the business for several months without any cash flow could be $1,000,000.00.[38]

48.     When arriving at his opinion that Plaintiff sustained $4,976,956.00 in "damages" based on the speculative market value of Lincoln Rock as a fully functioning and profitable residential treatment facility, Dr. Fishkind made no deduction for the monies Plaintiff saved as a consequence of *not* opening the residential treatment facility. Indeed, even accepting the testimony most favorable to the Plaintiff, Lincoln Rock saved the costs of the renovations to convert the facility and at least $1,000,000.00 in start-up costs. In addition, Dr. Fishkind's initial report fails to account for the fact Lincoln Rock had already sold the property wherein the facility would be located and realized a profit of approximately $375,000.00.[39]  If the jury accepted Dr. Fishkind's flawed and misleading damages methodology, Plaintiff would impermissibly receive not only the speculative market value of Lincoln Rock as a fully functioning residential treatment facility, but also all of the costs it *never* incurred to create the business. *See e.g.,* Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003) (an aggrieved party should not be placed in a better position through the award of damages); *see also,* White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002).

49.     Dr. Fishkind's damages methodology is fundamentally flawed and misleading as it calculates Plaintiff's damages as the $4,976,956.00 alleged market value for a property Plaintiff no longer owns, and fails to make any deduction for at least $1,000,000.00 that Plaintiff saved as a consequence of not opening the proposed residential treatment facility. Such a flawed

---

[37] Bernard Rock 6/21/2016 depo. 67:19-67:19 (Mr. Rock was the sole member of Lincoln Rock, LLC); 28:12-28:18 (prior to 2012, Mr. Rock had never visited a residential treatment facility or studied anything having to do with the licensure of one); 187:15-189:10 (anticipated a profit after 9-months). Excerpts attached as Exhibit "11."
[38] Bernard Rock 6/21/2016 depo. 190:7-190:15. Excerpts attached as Exhibit "11."
[39]  See, Exhibit "9" (Lincoln Rock purchased the property for a total of $625,000.00) and Exhibit "10" (Lincoln Rock sold the property for $1,000,000.00).

methodology renders Dr. Fishkind's opinion unreliable and inadmissible. *See*, <u>Children's</u> <u>Broadcast Corp</u>, 245 F.3d at 1018 (excluding expert testimony because the expert ignored relevant evidence that was less favorable to the client).

**V.   DR. FISHKIND ADMITTED THAT HIS METHODOLOGY IS UNRELIABLE WHEN HE CHANGED IT ON THE LAST DAY OF DISCOVERY AND ACKNOWLEDGED HIS CONCLUSIONS WERE OFF BY $1,419,282.00.**

50.     Plaintiff served a "supplemental" report from Dr. Fishkind on the last day of discovery and 4 ½-months after Plaintiff's expert disclosures were due.[40] In the "supplemental" report, Dr. Fishkind utilized a new methodology; offered a completely new opinion resulting in a change of $1,419,282.00 in damages; impermissibly included new analysis and substantive opinions; changed his calculation on the value attributed to per-licensed bed for comparable residential treatment facilities; admitted committing a glaring error; and included an improper rebuttal in response to the opinion from Defendant's expert economist, Dr. Stephen E. Durham, more than 2 months after Plaintiff missed the rebuttal deadline. Defendant has served a separate motion to exclude the "supplemental" opinion of Dr. Fishkind which is pending before this court[41] and therefore Defendant will only briefly address the significance of this new opinion here.

51.     In his new opinion, Dr. Fishkind changes the facilities he initially used as comparators to Lincoln Rock, changes the per-bed value of "comparable" residential treatment facilities to $214,922.00,[42] and deducts an additional $955,689.00 from his damages model

---

[40] Plaintiff's Supplemental Rule 26 Disclosure of Henry H. Fishkind, Ph.D (8/29/2016) is attached as Exhibit "2".
[41] Defendant City of Tampa's Motion to Strike Plaintiff's Supplemental Rule 26 Disclosure and Exclude Supplemental Report and Testimony of Henry H. Fishkind, PhD and Incorporated Memo of Law. (Doc. No. 44).
[42] Dr. Fishkind created a random selection criteria - American facilities with 100 beds or fewer - then failed to follow his own criteria by mistakenly including in his "comparable sales" subset the acquisition of Croxton Warwick Lodge, an inpatient facility located in England and therefore excluded under his own criteria.  Curiously, Dr. Fishkind referred to this as a "coding error."  Plaintiff's Supplemental Rule 26 Disclosure of Henry H. Fishkind, PhD (8/29/2016) at ¶3.0.

(representing the net proceeds of the sale of the Lincoln Rock property).[43] Dr. Fishkind acknowledges in his new report that the changes were made in response to the critique of the City's expert economist, Dr. Stephen E. Durham.[44]

52.     Dr. Fishkind now openly admits that his initial analysis was so fatally flawed that his original damage calculation was "off" by $1,419,282.00.  Dr. Fishkind now also deducts the proceeds of the sale of the Lincoln Rock real estate from his damages opinion, but fails to fully follow his new methodology because he fails to deduct the $1,000,000.00 Lincoln Rock *saved* as a consequence of not opening the proposed residential treatment facility. In short, Dr. Fishkind's new methodology is as equally flawed as his initial one. *See*, In re Live Concert Antitrust Litig., 863 F. Supp. at 994 (economist excluded when he failed to properly apply his own methodology of statistical damages analysis); Kilpatrick, 613 F.3d at 1343 (expert properly excluded for failing to reliably apply his own methodology).

53.     The City contends that Dr. Fishkind's shifting and wholly unreliable methodologies offered throughout the litigation of this case render his opinion unreliable and inadmissible under Daubert. *See*, Kumho Tire, 526 U.S. at 141 (for an expert opinion to be admissible it must have a reliable methodology based on solid foundational principles). The impermissible serving of a new report without this court's permission only compounds the problem, as the new report suffers from the same flaws of improper methodology and rank speculation.

## CONCLUSION

54.     In both his initial opinion and his supplemental opinion (served on the last day of discovery), Dr. Fishkind offers fundamentally flawed opinions not based on any reliable

---

[43] Id. at ¶3.0.
[44] Id.; Expert Report of Stephen Durham (6/18/16) at fn. 2.

methodology; makes unsupported speculative leaps and assumptions with no underlying factual support or rationale; fails to correctly apply his own methodology to the facts of this case; and fails to include significant factors in his damages methodology, including the costs Plaintiff saved as a result of not opening the proposed residential treatment facility. Dr. Fishkind's opinions are riddled with errors, misstatements, internal inconsistencies, and flawed methodologies. As the appellate court in <u>Moore v. Int'l Paint, L.L.C.</u>, noted when excluding the opinion of an expert witness under similar circumstances:

> [A] few scattered errors in an expert report are not necessarily grounds for exclusion. Here, however, the universe of facts assumed by the expert differs frequently and substantially from the undisputed record evidence. Additionally, the expert made numerous assumptions with no apparent underlying rationale. Accordingly, the district court did not abuse its discretion in holding that [the expert's] opinion…was inadmissible under Federal Rule of Evidence 702. 547 F. App'x 513, 516–17. (5th Cir. 2013).

Defendant therefore moves this court for an Order excluding Dr. Fishkind from offering any testimony or opinion in this case pursuant to <u>Daubert</u> and Fed. R. Evid. 702.

### <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 23rd day of September, 2016, a true and accurate copy has been furnished via Email to: Toyin K. Aina-Hargrett, Esq., City of Tampa, 315 East Kennedy Blvd., 5th Floor, Tampa, FL 33602, (Toyin.AinaHargrett@ci.tampa.fl.us and Lisa.Levy@tampagov.net); and Ethan J. Loeb, Esq., David Smolker, Esquire, Jon P. Tasso, Esquire, Smolker, Bartlett, Loeb, Hinds & Sheppard, P.A., 100 North Tampa Street, Suite 2050, Tampa, FL 33602, (ethanl@smolkerbartlett.com, davids@smolkerbartlett.com, jont@smolkerbartlett.com).

    /s/ Thomas P. Scarritt, Jr.
**THOMAS P. SCARRITT, JR.**
Florida Bar Number:  0378781
**MARTIN J. CHAMPAGNE, JR.**
Florida Bar Number: 0605921
SCARRITT LAW GROUP, P.A.
1405 West Swann Avenue
Tampa, Florida 33606

Email: courtpleadings@scarrittlaw.com
Telephone:  (813) 258-2300
Facsimile:  (813) 258-3242
Attorneys for Defendant City of Tampa