UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**LINCOLN ROCK, LLC,**
a Florida limited liability company

    Plaintiff,                                    Case No: 8:15-cv-01374-JSM-JSS

v.

**CITY OF TAMPA, a Florida
Municipal corporation,**

    Defendant.
_____/

**PLAINTIFF, LINCOLN ROCK, LLC'S RESPONSE IN OPPOSITION TO DEFENDANT, CITY OF TAMPA'S MOTION TO STRIKE PLAINTIFF'S SUPPLEMENTAL RULE 26 DISCLOSURE AND EXCLUDE SUPPLEMENTAL REPORT AND TESTIMONY OF HENRY H. FISHKIND, PH.D AND INCORPORATED MEMORANDUM OF LAW (Dkt. 44).**

Plaintiff, Lincoln Rock, LLC ("Lincoln Rock"), by and through undersigned counsel, hereby responds in opposition to Defendant, City of Tampa's (the "City") Motion to Strike Plaintiff's Supplemental Rule 26 Disclosure and Exclude Supplemental Report and Testimony of Henry H. Fishkind, Ph.D. ("Dr. Fishkind") and Incorporated Memorandum of Law ("Motion") as follows:

**INTRODUCTION**

As is set forth more particularly below, it is transparently clear that the City is playing a game of "gotch ya." It prevented Dr. Fishkind from reviewing the documents upon which the City's damages expert relied to critique Dr. Fishkind's report. It strategically cancelled its deposition of Lincoln Rock's damages expert, Dr. Fishkind, mere minutes before it was scheduled to begin. It did so in a calculated effort to later attempt: (i) to prevent Dr. Fishkind

1

from correcting his damages estimate—***even though such correction agrees with the City's expert's opinions and only benefits the City by $1,419,282***; and (ii) to prevent Dr. Fishkind from responding to the City's damages expert's ***new supplemental opinions elicited by the City at his deposition taken one week before the discovery cutoff.***  The City should not be able to strategically stick its head in the sand, and then feign prejudice, which if it exists at all, is of its own creation, and can be easily cured.  This Court should deny the City's Motion.

## FACTUAL BACKGROUND

Lincoln Rock was formed in 2012 to provide a facility where individuals (the "Residents") afflicted with the disease of drug and alcohol addiction could live and receive treatment (the "Residential Treatment Facility"). (Dkt. 1 at ¶ 5) Recovering addicts who are not actively using drugs or alcohol are considered disabled under the federal Fair Housing Act (the "FHA") and the Americans With Disabilities Act ("ADA").[1] The Residents receive such treatment while living with other similarly situated individuals (i.e., recovering addicts). *Id.*

Lincoln Rock proposed to locate the Residential Treatment Facility at 3303 W. Lemon Street/804 North Lincoln Street in Tampa (the "Property"). (*Id.* at ¶ 13) The Property is zoned "RO-1" which allows residential treatment facilities as a Special Use II, which must be approved by the Tampa City Council. (*Id.* at ¶ 14-15)  In early 2013, Lincoln Rock applied for a Special Use II permit for the Residential Treatment Facility at the Property (the "Application"). (*Id.* at ¶ 19)  Three consultants, Dr. Eric Kaplan, Jacki Krone and Althea Macaraeg-Greco, were hired to

---

[1] It is well established that individuals recovering from drug or alcohol addiction are handicapped and disabled under the FHA and ADA, respectively.  *See Elliott v. City of Athens*, 960 F.2d 975, 977 (11th Cir. 1992); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 (11th Cir. 2008); *Caron Foundation of Florida, Inc. v. City of Delray Beach*, 879 F.Supp.2d 1353, 1363-64 (S.D. Fla. 2012).

assist Lincoln Rock in this endeavor, and to help in the concurrent effort to obtain licensing for the Residential Treatment Facility from the State of Florida.

After extensive review, the professional land planners at both the City of Tampa and the Hillsborough County City-County Planning Commission found respectively that the Application satisfied all of the City's land development codes and was consistent with the City's comprehensive plan. (*Id.* at ¶ 33) Public records reveal that two months prior to the June 13, 2013 public hearing before City Council, and unbeknownst to Lincoln Rock, Councilmember Charlie Miranda's legislative aide, Ms. Mary Bryan, coordinated neighborhood opposition.[2] As a result a crowd of angry neighbors in red shirts appeared on June 13, 2013 at the City Council meeting opposing the Application because they did not want recovering addicts in their neighborhood. The neighbors also flooded the City with emails, letters, and petitions, describing the Residential Treatment Facility as a place where criminals would gather and harm residents, including senior citizens and children. (Dkt. 46-4) One resident went so far as to suggest that Lincoln Rock would provide "crime opportunities" and "spread rehab houses" throughout Tampa Bay. (Dkt. 46-5)

In response to the angry neighbors, the City disregarded the recommendations of its professional land planners that the Application complied with the land development code and was consistent with the comprehensive plan, implemented the discriminatory desires of the neighborhood and denied the Application by a 6-1 vote. (Dkt. 1 ¶ 38) The lone dissenting City

---

[2] As shown at Dtk. 46-6 Ms. Bryan told the organizer of the neighborhood opposition (who happened to be "a friend to Charlie" Miranda) to "rally as much support as you can," and to lobby other commissioners for the neighborhood "cause" when the hearing date got closer.  On Mr. Miranda's behalf, Ms. Bryan wrote that it would be good to keep the elected Councilmember out of the loop "so that he doesn't have to disclose any conversations." *Id.*

3

council member characterized the opposition's view in her own handwriting at the top of her agenda packet as "NIMBY" (a/k/a "Not in My Backyard"). (Dkt. 50-3)

As a result of the City's denial of the Application, Lincoln Rock was unable to open the Residential Treatment Facility, and was forced to sell the Property. (Doc. 1. at ¶ 39) At the time that Lincoln Rock sold the Property, it had expended in excess of seven figures to purchase the land and develop and open the Residential Treatment Facility. (Dkt. 46-13 at 103-104) Following the sale of the Property, Lincoln Rock brought suit against the City for discrimination under the FHA and the ADA, seeking damages, for, among other things, the value of a twenty-one bed drug and alcohol treatment center that should have been approved.

### Lincoln Rock's Initial Rule 26 Disclosure on Damages

Lincoln Rock timely served its Initial Disclosures on September 11, 2015, in which Lincoln Rock described the damages it sought as follows:

> **Expenses Related to City's Conduct** – Lincoln Rock is claiming that the City's conduct caused Lincoln Rock to lose its investment in the business. Documents evidencing the expenses incurred to date will be produced to the City.
>
> **Loss of Property Value/Profits:** Lincoln Rock is claiming that the City's conduct caused the property's value to be lower than it would have been had the City acted according to the law, and that the City's conduct likewise caused Lincoln Rock to lose profits that would have been enjoyed but for the City's conduct. An expert is computing this category of damages, which will be disclosed at that time set forth in the case management order.

Thus, from the very outset of this case, Lincoln Rock disclosed the damages it may seek.

### Lincoln Rock Serves the Report of Dr. Henry Fishkind

Lincoln Rock retained Dr. Fishkind to compute damages based on loss of the ability to use the Property for a 21-bed residential treatment facility caused by the City's denial of the Application. Based on his extensive experience valuing entitlements of the type sought by

Lincoln Rock, Dr. Fishkind determined that the best way to compute damages would be based on the market value of the licensed beds that were reasonably expected to be approved by the City.

Pursuant to the initial Case Management and Scheduling Order filed September 4, 2015, Lincoln Rock timely filed its expert disclosures, including Dr. Fishkind's report, on April 18, 2016. (Dkt. 17)[3]

Based on his knowledge and expertise, Dr. Fishkind determined the best way to calculate damages is based on the expected market value of licensed beds, i.e. those beds having the requisite entitlements. (A copy of Dr. Fishkind's April 2016 Report is attached hereto as **Exhibit A.**) Dr. Fishkind determined that there is not only an active market for beds of this kind in the Tampa Bay area, but that the market is only expected to strengthen. While most transactions are private, Acadia Health Care Company, Inc ("Acadia") is a publicly traded company that actively acquires residential treatment facilities similar to that proposed by Lincoln Rock. Dr. Fishkind looked to various Acadia acquisitions to determine what someone would pay for an entitled 21-bed residential treatment facility. To ensure that the most comparable facilities are used to calculate an average price per bed value, Dr. Fishkind indicated that he excluded facilities that were part of large transactions, facilities located in the United Kingdom and facilities with greater than 100 beds. Dr. Fishkind utilized the acquisition data from the remaining transactions to determine an average per bed value in order to calculate Lincoln Rock's damages.

---

[3] Before its expert disclosures were due on May 2, 2016, the City sought leave for additional time to serve its expert reports, and otherwise extending discovery in this case. (Dkt. 23.) On April 25, 2016 this Court entered an Amended Case Management and Scheduling Order extending the deadline for the City to file its expert disclosures to June 16, 2016, and providing Lincoln Rock until June 30, 2016 to serve any rebuttal reports. (Dkt. 25). Thus, the City was effectively given an additional six weeks to provide its expert reports.

**The City Serves the Report of Dr. Stephen Durham**

On May 20, 2016, the City noticed Dr. Fishkind's deposition for July 27, 2016. After receiving a month and a half extension of time serve its expert report in response to Dr. Fishkind, the City served the report of Stephen Durham on June 16, 2016 which critiqued Dr. Fishkind's methodologies, but did not perform any independent damage analysis. In his report, Dr. Durham noted that the acquired facilities offered some services, such as outpatient treatment, that Lincoln Rock did not intend to offer. (Expert Report of Dr. Stephen Durham attached hereto as **Exhibit B** at 4). Based on this and other findings, he concluded that there was "insufficient evidence to conclude that the Acadia acquisitions used by Dr. Fishkind were comparable to Lincoln Rock and that the prices paid by Acadia are in any way a measure of the value of Lincoln Rock." *Id.* *Notably, however, Dr. Durham offered no facts, data or opinion whatsoever as to whether or not outpatient services had any affect on the price paid per residential treatment bed.* Dr. Durham also pointed out that, contrary to Dr. Fishkind's own selection criteria, Dr. Fishkind inadvertently included one of the UK facilities acquisition data in his weighted average calculation. At his deposition, Dr. Durham agreed that Fishkind's valuation approach was "legitimate." (Deposition of Dr. Stephen Durham attached hereto as **Exhibit C** at 82:10-17.) Dr. Durham then corrected this simple error and adjusted Dr. Fishkind's weighted average downward from $236,998 to $214,992 per bed. (**Exhibit B** at 3, n. 2)

Dr. Durham also concluded that Dr. Fishkind's damage estimate needed to be further reduced to account for the $1,000,000 sale of the Property in March 2015. Taking the sale of the Property into account results in a reduction in damages of $955,689 equal to the net proceeds

received by Lincoln Rock from the sale of the Property.[4] Correction of these two errors resulted in a reduction in damages claimed of $1,419,282. As noted, Dr. Durham failed to offer any facts, data or opinion whatsoever as to whether outpatient services affected the price paid per residential treatment bed.

## The Depositions and Discovery

Shortly after the City filed Dr. Durham's report, Lincoln Rock subpoenaed the documents and information that Dr. Durham relied on to support his opinions requesting that those documents be produced on or before July 22, 2016 to allow Dr. Fishkind the opportunity to review them in advance of his scheduled July 27, 2016 deposition.[5] Waiting until July 22nd, the City requested an extension to July 29th to produce the documents. Conveniently for the City, this meant that it would not be producing the documents until *after* Dr. Fishkind's deposition. Lincoln Rock agreed to the extension but only with the understanding that it would not have the ability to provide the documents to Dr. Fishkind in advance of his deposition.[6]

On July 26, 2016, counsel for the parties and Dr. Durham all appeared at Dr. Fishkind's office in Orlando for Dr. Fishkind's scheduled deposition. Without explanation, and for reasons that only became apparent with the filing of its motion to strike, the City cancelled the deposition and has never sought to reschedule it.

Ultimately, the documents Durham relied upon for his opinions were not made available to Lincoln Rock until August 2, 2016, again *after* the City cancelled Dr. Fishkind's deposition.

---

[4] The net proceeds received by Lincoln Rock equaled the $1,000,000 sale price less $44,311 in closing costs and taxes.

[5] The Notice of Intent to Serve Subpoena to Produce Documents is attached hereto as **Exhibit D**.

[6] See email correspondence dated July 22, 2016 attached hereto as **Exhibit E.**

Lincoln Rock deposed Dr. Durham on August 23, 2016, a week before the discovery cutoff. At that time he offered the following new supplemental opinions not contained in his report:

> A: *I don't think I'm saying that his approach isn't legitimate*. I think *what I'm saying or trying to say in the report is it just doesn't go far enough.* It starts with one measure and then doesn't go any further. It doesn't consider, you know, different types of treatment facilities, because I don't know if they sell at different rates, you know, alcohol versus eating disorders. *It doesn't go into, you know, outpatient facilities, so I -- I mean, I think there are other measures.*[7]

Dr. Durham further offered the following additional supplemental opinions not contained in his report:

> A: *we need to somehow segregate the value of the facility that's only inpatient from the facility that is both inpatient and outpatient, because that in my mind kills the whole relationship of price per bed. . . . I would expect, assuming that outpatient makes any profits, that that's going to have higher value. And I think you have to control for that, and I don't think he did that.*[8]

On redirect examination, Counsel for the City then elicited from Dr. Durham the following additional new supplemental opinions not contained his report:

> Q: So in order to utilize the comparable sales of these seven facilities, you really would have to do some sort of analysis to determine what portion of their sales price was attributed to their outpatient capability, would you not?
>
> A: Well, correct. And I think I was asked about this. You would have to somehow try to disentangle. You know, we paid hypothetically, $100,000 a bed. Well, really, no, we didn't. We paid 60,000 for the bed and $40,000 for the outpatient treatment facility.[9]

Clearly, the City used the deposition of Dr. Durham to supplement Dr. Durham's report "through the back door" by offering new opinions not contained in his initial report explaining

---

[7] **Exhibit C** at 82:10-20. (emphasis added).

[8] *Id.* at 88:16 – 89:1. (emphasis added).

[9] *Id*. at 110:10-20.

8

for the first time how outpatient services "kills the whole relationship of price per bed."[10] To date, Dr. Durham produced no facts or data to support this opinion; he simply assumes it does. Lincoln Rock immediately transcribed Dr. Durham's deposition and provided it to Dr. Fishkind, who in turn immediately prepared a Supplemental Expert Report to respond to Dr. Durham's newly offered and unsupported opinions. Dr. Fishkind's supplemental report: (i) concludes that outpatient services are marginally profitable and do not contribute meaningful value to residential treatment facilities; (ii) concludes that it is standard industry practice to value residential treatment facilities on the basis of the number of licensed beds; and (iii) reduces his overall damages estimate by $1,419,282 to reflect the two aforementioned downward adjustments which Dr. Durham felt were required. Lincoln Rock then immediately served the City with Plaintiff's Supplemental Rule 26 Disclosure attaching a copy of Dr. Fishkind's Supplemental Expert Report. (A copy of Dr. Fishkind's Supplemental Report is attached hereto as **Exhibit F.**) It also offered to make Dr. Fishkind available for the deposition the City previously cancelled without explanation. The City rejected Lincoln Rock's offer, and instead now seeks to strike the supplemental report and to prevent Dr. Fishkind from testifying to its contents.

## LEGAL ARGUMENT

### I. Dr. Fishkind's Supplemental Report was Disclosed Before the Discovery Cutoff and, Therefore is not Untimely.

"There is nothing in Rule 26 prohibiting a witness, even an expert witness, from timely providing new or modified opinions to complete or correct information previously provided or reported." *Tampa Bay Water v. HDR Engineering, Inc.,* 2011 WL 3475548, * 5 (M.D. Fla. 2011). "'[T]he party's duty to supplement extends both to information included in the report and

---

[10] *Id.* at 88:19-20.

to information given during the expert's deposition and any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.'" *Id.* (*citing* Fed. R. Civ. P. 26(a)(3)). *See also, Talbert v. City of Chicago,* 236 F.R.D. 415, 423-24 (N.D. Ill. 2006) (Rule 26 allows witness to improve original report with supplemental). Additionally, nothing in the Rule prohibits a party from supplementing an expert report with information available prior to the initial report. *Talbert*, at 423. The ultimate question is whether "the core opinions remain the same." *In re Accutane Products Liability Litigation,* Case No. 8:04-md-2523-T-30TMB, 2007 WL 201091, at * 1 (M.D. Fla. Jan. 24, 2007).

The City incorrectly contends that Dr. Fishkind's supplemental report is untimely and should therefore be excluded. The trial is scheduled during the December 5, 2016 trial term with a pre-trial conference set for November 3, 2016. Rule 26(e)(2) imposes a duty to supplement information included in an expert report, and even information given during an expert's deposition. The Advisory Committee Notes provide additional guidance on Rule 26(e) in stating that "[s]upplementations need not be made as each new item of information is learned but should be made at appropriate intervals during the discovery process and with special promptness as the trial date approaches." Adv. Comm. Notes (1993 Amendments). Such supplementation is due under Rule 26(a)(3) no later than thirty days before trial. Lincoln Rock's supplemental report was filed August 29, 2016 prior to the discovery deadline and months before the trial.

The cases relied on by the City in its Motion are wholly inapplicable because they pertain to situations where the supplementation occurred ***after*** the discovery deadline had passed. For example, in *Mitchell v. Ford Motor Co.*, the expert testimony was stricken because the expert did not disclose the necessary scientific bases of his opinions prior to his deposition, and instead waited until ***after*** the *Daubert* hearing. 318 Fed. Appx. 821, 825 (11th Cir. 2009). *See also*

*Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 738 (7th Cir. 1998) (affirming exclusion of supplemental expert testimony where the initial report was filed ***after*** the extended discovery deadline and was "markedly deficient"); *Akeva LLC v. Mizuno Corp.,* 212 F.R.D. 306, 308 (M.D. N.C. 2002) (excluding supplement filed after the discovery deadline containing opinions resulting from testing conducted ***after*** disclosures and depositions); *Keener v. U.S.,* 181 F.R.D. 639, 642 (D. Mont. 1998) (finding the proposed supplemental report, filed two months ***past*** its deadline, included dramatically new opinions and thus was not a supplement and therefore should have been included in the initial report); *Thames v. City of Pensacola*, No. 303CV586/RV/MD, 2005 WL 1876175, at * 2 (N.D. Fla. 2005) (striking affidavit from expert containing new opinions four months ***after*** the close of discovery).

The supplemental report of Dr. Fishkind was filed ***before*** the discovery deadline and well before the trial is scheduled to begin. The deposition of the City's damages experts took place August 23 and August 25, mere days before discovery cut-off of August 29, 2016. Immediately following the conclusion of those expert depositions, at which new opinions were offered, Lincoln Rock expeditiously served Dr. Fishkind's Supplemental Expert Report directly addressing the issues raised and new opinions offered by Dr. Durham. Further, the City was given numerous opportunities to depose Dr. Fishkind and strategically failed to do so in order to feign prejudice.[11]

## II. Even if Dr. Fishkind's Supplemental Expert Report is Considered Untimely The Late Disclosure Is Harmless or Substantially Justified.

A party is permitted to supplement its disclosures when untimely if the disclosures are harmless or substantially justified. Fed. R. Civ. P. 37(c)(1); *OFS Fitel, LLC v. Epstein, Becker*

---

[11] See **Exhibit G**.

*and Green, P.C.,* 549 F.3d 1344, 1363 (11th Cir. 2008) (finding district court abused its discretion in excluding expert report where the delay was substantially justified). *See also Siverstein v. Procter & Gamble Mfg. Co.*, 700 F.Supp.2d 1312, 1320 (S.D. Ga. 2009) (stating that a party's failure to disclose "is harmless when no prejudice results to the opposing party."); *Travelers Indem. Co. of Illinois v. Royal Oak Enters., Inc.,* 2004 WL 3770572, at * 2 (M.D. Fla. 2004) (same). To determine whether or not a party will be prejudiced, the court should consider: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Tampa Bay Water,* 2011 WL 3475548 at * 3. *See also Two Men and a Truck Int'l, Inc. v. Residential & Commercial Transp. Co., LLC,* Case No. 4:08cv67-WS/WCS, 2008 WL 5235115, at * 2 (N.D. Fla. Oct. 20, 2008) (same) (*citing Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.,* 318 F.3d 592, 597 (4th Cir. 2003)).

  Moreover, potential prejudice is commonly cured by allowing the parties further targeted discovery. *Engle v. Taco Bell of America, Inc.,* No. 8:09-cv-2102-T-33TBM, 2011 WL 883639, at * 2 (M.D. Fla. Mar. 14, 2011) (reopening discovery to allow depositions of late disclosed experts cured any prejudice). *See also Ellison v. Windt*, Case No. 6:99-CV-1268-ORLKRS, 2001 WL 118617, at *1 (M.D. Fla. Jan. 24, 2001) (availability for deposition held as a key factor to ensure no prejudice); *Hamatie v. Louisville Ladder, Inc.,* Case No. 6:06-cv-817-Orl-18KRS, 2007 WL 4365429, at *1 (M.D. Fla. June 13, 2007) (holding that plaintiff's untimely disclosure of a supplemental expert report to the defendant was harmless, as the defendant can depose the expert and remained free to cross-examine the expert at trial regarding any allegedly conflicting

theories he may have provided). Lincoln Rock has and continues to make Dr. Fishkind available for deposition but the City, for unknown reasons, remains unwilling to take his deposition.

### A. Dr. Fishkind's Supplemental Report Correcting Incorrect or Incomplete Information is Harmless.

Rule 26(e)(1) requires that an expert supplement his report and disclosures in certain limited circumstances. "Those circumstances are when the party or expert learns the information previously disclosed is incomplete or incorrect in some material respect." *See* Fed. R. Civ. P. 26(e); *Cook v. Rockwell Intern. Corp.*, 580 F.Supp.2d 1071, 1169 (D. Colo. 2006).

Lincoln Rock does not dispute the mathematical errors brought to light in Dr. Durham's expert report. Thus, Dr. Fishkind was not only substantially justified in supplementing his report, but was arguably required to do so. *Medtronic Vascular, Inc. v. Abbot Cardiovascular Systems, Inc.*, Case No. C-06-1066 PJH, 2008 WL 4601038, at * 2 (N.D. Cal. 2008) (allowing untimely supplement to their expert report to correct mistakes within the original report). Lincoln Rock intended to correct the mathematical errors at the July 27, 2016 scheduled deposition of Dr. Fishkind. But, because the City cancelled Dr. Fishkind's deposition and never rescheduled it (in what now appears to have been a strategic effort to prevent Dr. Fishkind from reducing Lincoln Rock's damage claim), and because Fed. R. Civ. P. 26 required the correction of any errors, Lincoln Rock's only vehicle for correcting the mathematical errors was to supplement its disclosures and expert report.

Further, the City cannot in good faith claim surprise because it was the City's own expert who pointed out and quantified the errors in his report. At all times material hereto, the City was and is well aware of the mathematical errors and the effect of the correction on Dr. Fishkind's overall damages estimate. The City could have questioned Dr. Fishkind regarding the corrections but elected not to when it strategically cancelled his previously scheduled deposition. Lincoln

Rock relies on Dr. Fishkind to calculate a large portion of its damages claim and would therefore be severely prejudiced without him.

Lastly, the City can hardly claim in good faith that it has been prejudiced by Lincoln Rock's "late" disclosure, **_especially since the correction inures to the City's benefit in the amount of $1,419,282_**![12] *See generally Travelers Indem. Co. of Illinois v. Royal Oak Enters., Inc.,* 2004 WL 3770572, at * 2 (M.D. Fla. 2004) (stating that a party's failure to disclose is harmless when no prejudice results to the opposing party).

### B. Dr. Fishkind's Supplemental Report Responding to Dr. Durham's Supplemental Opinions is Both Harmless and Substantially Justified.

The City contends that Dr. Fishkind's supplemental report contains new opinions to bolster his initial opinions, but this is simply incorrect. Dr. Fishkind's opinions directly respond to the opinions of Dr. Durham newly proffered at his deposition taken after the expert rebuttal deadline. Therefore, the supplementation of Dr. Fishkind's report to respond to Dr. Durham's new opinions is substantially justified. In his report, Dr. Durham offered no facts, data or opinion whatsoever as to whether the fact that the Acadia acquisitions also included outpatient services affected the price paid per residential treatment bed. It was not until his deposition that Dr. Durham aided by the City's counsel explained the potential significance of outpatient services on the price paid per bed for a residential treatment facility. *Marco Island Cable, Inc. v. Comcast Cablevision of the South,* 2006 WL 1722341, at * 1 (M.D. Fla. 2007) (finding that supplement to expert report was permissible after deadline for such reports expired because the supplement was in response to the deposition testimony given **_after_** the deadline) (emphasis added). *See also U.S. v. Barlow*, 2008 WL 5459196, at * 4 (S.D. Fla. 2008) (stating that the supplemental opinions

---

[12] See fn. 2 of Dr. Stephen Durham's expert report, attached hereto as **Exhibit B**. The exclusion of Croxon was initially intended and would act to reduce the damage claim by $463,593.00,

14

constitute a justifiable supplement because they relate to deposition testimony give **_after_** the deadline for expert rebuttal).

Additionally, an expert may supplement his expert report in response to reading the deposition of the other party's expert. *Tampa Bay Water*, 2011 WL 3475548 at *3 (the supplemental report "was a fair response to [Plaintiff's] ongoing efforts to undermine [the expert's] theory first propounded by [the expert's initial report])"; *Whately v. Merit Distribution Services*, 166 F. Supp. 1350, 1356 (S.D. Ala. 2001) (appropriate for an expert to respond to deposition of opposing party's expert in supplemental report).

Dr. Fishkind's new opinions are limited to meeting the new opinions offered by Dr. Durham and elicited by the City's counsel at Dr. Durham's August 23, 2016 deposition. These opinions were not contained in Dr. Durham's expert report; rather they were disclosed for the first time at his deposition a week before the discovery cutoff deadline leaving Lincoln Rock less than a week to attempt to address them which it promptly did by serving Dr. Fishkind's supplemental expert report. Dr. Fishkind's opinion that the offering of outpatient services does not affect the price per bed paid for residential treatment facilities is simply a predicable response to Dr. Durham's supplemental opinions given for the first time at his deposition. *See Innogenetics, N.V. v. Abbot Laboratories,* 2006 WL 5942867, at * 1 (W.D. Wis. 2006) (finding no basis to exclude the supplemental opinion offered by the plaintiff where there was no reason to previously disclose an expert's opinion on an issue until the defendant disclosed that it intended to rely on that issue as a defense). Further, at her deposition, Jacki Krone confirmed that there is little value in providing outpatient treatment services.[13] Ms. Krone additionally explained

---

[13] See excerpts from the deposition of Jacki Krone on July 22, 2016, attached hereto as **Exhibit H** at 46:21 – 49:21.

that insurance companies provide low reimbursements for outpatient services. Similarly, Dr. Fishkind had no reason to offer an opinion on the outpatient issues until it became clear that Dr. Durham would testify to the effect that provision of outpatient services "kills" Dr. Fishkind's price per bed valuation opinion. Lincoln Rock should have the ability to respond. Therefore, the City cannot in good faith claim prejudice where they strategically continue to stick their head in the sand and refuse to take the deposition of Dr. Fishkind.

### **Excluding or Striking Evidence is an Extreme Sanction**

Not permitting the late disclosure or excluding evidence is an extreme sanction, not normally imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 792-93 (3d Cir. 1994). *See also Whetstone Candy Co., Inc. v. Nestle USA, Inc.,* Case No. 3:01-cv-415-J-25HTS, 2003 WL 2568630, at *3 (M.D. Fla. June 2, 2003) (finding that even if the court finds a party's failure to disclose is neither substantially justified or harmless, the sanction of exclusion is not mandatory); *Shaw v. Pizza Hut of America, Inc.,* Case No. 8:08-CV-27-T-24EAJ, 2009 WL 1228440, at * 2 (M.D. Fla. May 4, 2009) (denying the defendant's motion to strike certain witnesses based upon the plaintiff's untimely disclosure of their expert reports so long as the plaintiff produced such witnesses for deposition, as striking an expert is too drastic of a remedy)*; Zerega Ave. Realty Corp. v. Hornbeck Offshore Trans., LLC,* 571 F.3d 206, 213 (2d Cir. 2009) (finding trial court abused its discretion in excluding expert opinion for noncompliance with pretrial order where, inter alia, the excluded expert's testimony was critical to the parties defense). "Moreover, the Court vastly prefers to decide case on their merits, rather than excluding evidence." *Collins v. United States,* Case No. 3:08-cv-923-J-32JRK, 2010 WL 4643279, at *4 n. 6 (M.D. Fla. Nov. 9, 2010).

Further, the court in *RMED International, Inc. v. Sloan's Supermarkets, Inc.,* noted that, "[a] party may supplement its required Rule 26 disclosures, including expert reports, up to thirty days before trial. Fed. R. Civ. P. 26(e)(1)." 2002 WL 31780188, at * 3 (S.D.N.Y. 2002) (explaining that regardless of whether the new report is supplemental or rebuttal, the court will allow it because the exclusion of expert testimony is a drastic remedy). Here, Lincoln Rock did not act with willful deception or flagrant disregard but rather is promptly responding to a new defense revealed during the deposition of Dr. Durham, and is correcting harmless errors that have been known to the City for months. *Tampa Bay Water*, 2011 WL 3475548, at * 3 (stating that the risk of surprise at trial is one of the primary considerations in determining whether to exclude evidence under Rule 37(c)(1)). Additionally, the new report will not disrupt the trial which is set to begin months from now. *RMED International*, 2002 WL 31780188, at * 4 (finding a new report would not disrupt trial set to begin a within a month).

## CONCLUSION

For the above reasons, Lincoln Rock respectfully requests that the Court enter an Order denying Defendant's Motion, award Lincoln Rock its fees and costs in having to respond to the City's frivolous Motion, and grant any further relief that the Court deems appropriate.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 6, 2016, I served the following electronically to **TOYIN K. AINA-HARGRETT, ESQUIRE** (Toyin.Aina-Hargrett@tampagov.net, Lisa.Levy@tampagov.net), City of Tampa, 315 E. Kennedy Boulevard, 5th Floor, City Hall, Tampa, FL 33602; and **THOMAS P. SCARRITT, JR., ESQUIRE**, courtpleadings@scarrittlaw.com, 1405 W. Swann Avenue, Tampa, FL 33606, Attorneys for Defendant.

/s/   Jon P. Tasso
ETHAN J. LOEB
Florida Bar No. 0668338
ethanl@smolkerbartlett.com

17

susanm@smolkerbartlett.com
JON P. TASSO
Florida Bar No. 0120510
jont@smolkerbartlett.com
cynthiam@smolkerbartlett.com
DAVID SMOLKER
Florida Bar No.0349259
davids@smolkerbartlett.com
roxanner@smolkerbartlett.com
SMOLKER, BARTLETT, LOEB,
HINDS & SHEPPARD, P.A.
100 N. Tampa Street, Suite 2050
Tampa, Florida 33602
Attorney for Plaintiff