UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LINCOLN ROCK, LLC,

      Plaintiff,

v.                                        Case No: 8:15-cv-1374-T-30JSS

CITY OF TAMPA,

      Defendant.

_____/

## ORDER

THIS MATTER is before the Court on (1) Plaintiff's Motion to Compel Better Answers to Interrogatories ("Motion to Compel") (Dkt. 39), which Defendant City of Tampa opposes (Dkt. 43) (2) Defendant's Motion to Strike and Preclude Plaintiff's Damage Claims Not Previously or Properly Disclosed ("Motion to Strike Damages") (Dkt. 41), which Plaintiff opposes (Dkt. 50) and (3) Defendant's Motion to Strike Plaintiff's Supplemental Rule 26 Disclosure and Exclude Supplemental Report and Testimony of Henry H. Fishkind, Ph.D. ("Motion to Strike Report") (Dkt. 44), which Plaintiff opposes (Dkt. 53).  On October 13, 2016, a hearing was held on the motions.  For the reasons set forth below, the Motion to Compel is denied, the Motion to Strike Damages is denied, and the Motion to Strike Report is granted in part and denied in part.

## BACKGROUND

Plaintiff is a Florida limited liability company that was formed in 2012 and has one member, Bernard Rock.  (Dkt. 1 ¶¶ 1, 5.)  Plaintiff alleges it was formed for the purpose of establishing a residential treatment facility within the City of Tampa to treat those addicted to alcohol or controlled substances.  (*Id.* ¶¶ 5–6.)

Plaintiff selected a property in Tampa to acquire to house the residential facility ("Property"), which, Plaintiff alleges, was zoned for professional residential facilities as a special use. (*Id.* ¶¶ 13–14.) After inquiring with Defendant concerning what would be required to open a treatment facility at the Property, Plaintiff alleges that he was instructed to file an application for special use approval. (*Id.* ¶¶ 15–16.) Thereafter, Plaintiff purchased the Property and filed the application with Defendant ("Application"). (*Id.* ¶¶ 18–19.)

Plaintiff alleges that, at the first level of review of the Application, Defendant's staff recommended that the City Council approve the Application. (*Id.* ¶¶ 21–22.) At the next level of review, Defendant's Planning Commission also recommended its approval. (*Id.* ¶¶ 30–33.) Meanwhile, neighbors surrounding the Property opposed the Application. (*Id.* ¶¶ 24–29.) Defendant held a public hearing, at which neighbors voiced their concerns regarding the treatment facility and opposition to approval of the Application. (*Id.* ¶¶ 34–36.)

In a vote of six to one, the City Council denied the Application. (*Id.* ¶ 38.) As a result of Defendant's denial of the Application, Plaintiff alleges that it was unable to open the treatment facility and was "forced to sell the Property." (*Id.* ¶¶ 39–40.) At the time of the sale, Plaintiff alleges it "had expended in excess of seven figures to develop and open" the treatment facility on the Property. (*Id.* ¶ 40.)

Plaintiff filed a two-count complaint against Defendant, alleging violations of federal anti-discrimination laws, specifically the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ("FHA"), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"). (*Id.* ¶¶ 3, 43–68.) Specifically, Plaintiff alleges that the potential residents of its proposed treatment facility fall within the FHA's and ADA's definitions of disabled and handicapped. (*Id.* ¶ 7.) Therefore, by denying Plaintiff the ability to open the treatment facility, and thus denying the potential residents

housing, on the basis of the disabilities of its potential residents, Defendant violated Plaintiff's and the potential residents' rights under the FHA and ADA.  (*Id.* ¶¶ 43–68.)

Plaintiff seeks declaratory judgment that Defendant illegally discriminated against Plaintiff and its potential residents in violation of the FHA and ADA, damages under the FHA and ADA, and attorneys' fees and costs.  (*Id.* ¶¶ a–d.)  In response, Defendant asserts that it acted in good faith, that its actions were "based on legitimate, non-discriminatory reason[s]," and that Plaintiff failed to mitigate its damages.  (Dkt. 15 at 4–5.)

## APPLICABLE STANDARDS

### I.    Motion to Strike Report

Pursuant to Federal Rule of Civil Procedure 26, a party must disclose to the other parties the identity of any expert witness it may use at trial.  Fed. R. Civ. P. 26(a)(2)(A).  For experts "retained or specifically employed to provide expert testimony," the expert disclosure must be accompanied by a written report that contains, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B).  Expert disclosures must be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).

The parties must supplement their expert disclosures in accordance with Rule 26(e).  Fed. R. Civ. P. 26(a)(2)(E).  Rule 26(e) requires a party to supplement or correct its disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  "Any additions or changes" to an expert's report or to information given during the

expert's deposition "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."[1]  Fed. R. Civ. P. 26(e)(2).

An expert report may be supplemented, pursuant to Rule 26(e), when the party learns that the original disclosure was incomplete or incorrect, but may not be supplemented in order to cure a major omission or to remedy an expert's inadequate or incomplete preparation.  *Goodbys Creek, LLC v. Arch Ins. Co*., No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *2 (M.D. Fla. Apr. 27, 2009); *see, e.g., Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1248-52 (M.D. Fla. 2012) (excluding expert's second report, served on the last day of discovery, which included opinions regarding claims that were not addressed in the initial report); *K & H Dev. Grp., Inc. v. Howard*, 255 F.R.D. 562, 567-68 (N.D. Fla. 2009) (striking an expert's "supplemental" report that included a new theory of damages, which was based on information that was available when the expert prepared his initial report); *In re Accutane Prods. Liab. Litig*., No. 8:04-MD-2523T30TBM, 2007 WL 201091, at *1 (M.D. Fla. Jan. 24, 2007) (denying motion to strike supplemental expert report, served after the close of discovery, where the report revealed additional literature review and, in some areas, a degree of new or additional rationale in support of the expert's conclusions, but the core opinions remained the same).

Thus, "[t]here is nothing in Rule 26 prohibiting a witness, even an expert witness, from timely providing new or modified opinions to complete or correct information previously provided or reported" and "[i]ndeed, the witness who learns of new material information not previously disclosed is obliged to timely disclose the information to the parties."  *Tampa Bay Water v. HDR Eng'g, Inc.*, No. 8:08-CV-2446-T-27TBM, 2011 WL 3475548, at *5 (M.D. Fla. Aug. 9, 2011)

---

[1] Pretrial disclosures include the names of witnesses whom the party expects to or may call at trial, the designation of witnesses whose testimony may be presented by deposition, and the identification of each exhibit that the party expects to or may offer at trial. Fed. R. Civ. P. 26(a)(3)(A).  Unless otherwise ordered by the court, these disclosures must be made at least 30 days before trial. Fed. R. Civ. P. 26(a)(3)(B).

(denying a motion to strike a supplemental expert report because it was "consistent with [the expert's] initial opinions" and there was no prejudice to the other party).  Rule 26(e) "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report."  *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225, at *6 (S.D. Fla. June 2, 2016) (internal quotations omitted).

However, Rule 26(e) "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy."  *Cochran v. Brinkmann Corp.*, No. 1:08-cv-1790-WSD, 2009 WL 4823858, at *5 (N.D. Ga. Dec. 9, 2009).  "Rather, Rule 26 imposes a duty on parties to comply with the disclosure deadlines.  It grants them no right to produce information in a belated fashion."  *Mobile Shelter*, 845 F. Supp. 2d at 1250 (internal citations and quotations omitted).  "Courts have broad discretion to exclude untimely-disclosed expert witness testimony — even when they are designated as 'supplemental' reports . . . [c]onsequently, a party cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness report."  *Companhia*, 2016 WL 3102225, at *5–6 (striking a supplemental report because its disclosure was untimely and it was not in fact supplemental).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  This sanction is "self-executing" in that it may be imposed without the filing of a motion under Rule 37(a).  Fed. R. Civ. P. 37(c)(1), advisory committee's note to 1993 amendment.  However, "[t]he evidentiary exclusion sanction is not necessarily 'automatic,' even in the absence of substantial justification and harmlessness, because Rule 37(c)(1) provides that a court may

impose other appropriate sanctions '[i]n addition to or instead of this sanction.'" *Collins v. United States*, No. 3:08-CV-923-J-32JRK, 2010 WL 4643279, at *5, n.7 (M.D. Fla. Nov. 9, 2010) (quoting Fed. R. Civ. P. 37(c)(1)) (citing *Prieto v. Malgor*, 361 F.3d 1313, 1318 (11th Cir. 2004)).

The court has broad discretion in deciding whether a failure to disclose evidence is substantially justified or harmless under Rule 37(c)(1). *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 8:06-cv-00040-T-33MAP, 2009 WL 92826, at *3 (M.D. Fla. Jan. 14, 2009). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 825 (11th Cir. 2009) (internal quotations omitted). In determining whether a failure to disclose evidence is substantially justified or harmless, courts are guided by the following factors: (1) the unfair prejudice or surprise of the opposing party; (2) the opposing party's ability to cure the surprise; (3) the likelihood and extent of disruption to the trial; (4) the importance of the evidence; and (5) the offering party's explanation for its failure to timely disclose the evidence. *Mobile Shelter*, 845 F. Supp. 2d at 1250-51.

## II.    Motion to Strike Damages

As part of a party's initial disclosures, a party must provide "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii). A party must supplement or correct the disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

If a party fails to timely supplement its disclosures, as required by Rule 26(e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at

a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  A court, "[i]n addition to or instead of this sanction," may order "payment of the reasonable expenses, including attorney's fees, caused by the failure," "may inform the jury of the party's failure," or "may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." Fed. R. Civ. P. 37(c)(1).

The "party who is alleged to have failed to comply with Rule 26 bears the burden to show that its actions were substantially justified or harmless." *Parrish v. Freightliner, LLC*, 471 F. Supp. 2d 1262, 1268 (M.D. Fla. 2006).  Courts consider "the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the opposing party if the information had been admitted." *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009).

## III.    Motion to Compel

Through discovery, parties may obtain materials that are within the scope of discovery, meaning they are nonprivileged, relevant to any party's claim or defense, and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  When an interrogatory is served on a governmental agency, an officer or agent of the governmental agency "must furnish the information available to the party." Fed. R. Civ. P. 33(b)(1)(B).  Under Federal Rule of Civil Procedure 37, "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery," including "answer[s to] an interrogatory submitted under Rule 33." Fed. R. Civ. P. 37(a)(1), (3)(B)(iii).

**ANALYSIS**

I. **Motion to Strike Report**

A. **Background**

On September 4, 2015, the Court entered a Case Management and Scheduling Order, setting Plaintiff's deadline for expert disclosures as April 18, 2016, and Defendant's deadline for expert disclosures as May 2, 2016.  (Dkt. 17.)  On April 25, 2016, the Court, upon Defendant's motion, entered an Amended Case Management and Scheduling Order, extending Defendant's expert disclosures deadline until June 16, 2016, and setting Plaintiff's expert rebuttal disclosure deadline for June 30, 2016.  (Dkt. 25.)  The discovery deadline was August 29, 2016, and the dispositive and *Daubert* motions deadline was September 23, 2016.  (Dkt. 30.)

Plaintiff's expert, Henry Fishkind, Ph.D., prepared an expert report dated April 18, 2016 ("Initial Report").  (Dkt. 44-1.)  In the Initial Report, Dr. Fishkind gave the opinion that Plaintiff suffered nearly $5 million in damages.  (Dkt. 44-1.)  Dr. Fishkind based this conclusion on his opinion that "Plaintiff reasonably expected to have 21 licensed beds" at the residential treatment facility it sought to establish on the Property.  (Dkt. 44-1 ¶ 18.0.)  Because the sales of comparable facilities, which are "often purchased on the basis of the number of licensed beds," yielded $236,998 per bed, Dr. Fishkind concluded that Plaintiff suffered damages in the amount of $4,976,956.  (Dkt. 44-1 ¶ 18.0.)  Dr. Fishkind stated that, because he could not measure it to a reasonable degree of economic certainty, he "decided not to quantify the Plaintiff's damages based on the potential profitability of the [residential treatment facility] as the Plaintiff had planned" and, instead, "valued the damages based on the market value of the licensed beds that the Plaintiff reasonably expected to be approved."  (Dkt. 44-1 ¶ 24.0.)

On June 16, 2016, Defendant served its Rule 26(a)(2) expert disclosures, disclosing Stephen E. Durham, Ph.D. as its expert and attaching Dr. Durham's written report.  (Dkt. 53-2.)  In his report, Dr. Durham concluded that Plaintiff suffered economic damages totaling $90,000, assuming wrongdoing by Defendant.  (Dkt. 53-2.)  Dr. Durham based this conclusion on the difference in value of the Property with and without a special use permit.  (Dkt. 53-2 at 2.)  Dr. Durham's report addresses Dr. Fishkind's report, noting, among other things, (1) in reaching his average cost per bed, Dr. Fishkind included a facility in the United Kingdom in the calculus despite Dr. Fishkind stating that this facility should not be considered as a comparable facility (See Dkt. 44-1 ¶ 30.0); (2) that Dr. Fishkind failed to account for the $1,000,000 Plaintiff received from the sale of the Property in his damages; and (3) Dr. Fishkind's comparable facilities offered outpatient services, unlike Plaintiff's proposed facility, thus challenging the appropriateness of their use as comparable facilities.  (Dkt. 53-2 at 3–4.)

On July 22, 2016, Defendant served a notice of its intention to serve a subpoena *duces tecum* on Dr. Fishkind, commanding Dr. Fishkind to appear for deposition on July 27, 2016, and to produce at the deposition, among other things, documents upon which he relied in forming his opinions and conclusions.  At the hearing, Defendant's counsel stated that Dr. Fishkind produced his files in advance of his July 27, 2016, deposition.  However, Defendant canceled the deposition and Dr. Fishkind was not deposed.

On August 23, 2016, Dr. Durham was deposed.  (Dkt. 53-3.)  During his deposition, Dr. Durham answered questions regarding the portion of Dr. Durham's report that is critical of Dr. Fishkind's using comparable facilities that have outpatient services without explaining why they would still be comparable to Plaintiff's proposed residential treatment facility.  (Dkt. 53-3.)  Specifically, Dr. Durham testified as follows:

I mean, if we've got two facilities and they're both 21 beds but this one's got an outpatient, too, I would expect, assuming that outpatient makes any profits, that that's going to have a higher value. And I think you have to control for that, and I don't think [Dr. Fishkind] did that.

(Dkt. 53-3 at 88:21–89:1.)

On August 29, 2016, which was the discovery deadline, Plaintiff served a supplemental Rule 26 disclosure, attaching a supplemental expert report by Dr. Fishkind, dated August 29, 2016 ("Supplemental Report").  (Dkt. 44-9.)  In the Supplemental Report, Dr. Fishkind states that the purpose of the Supplemental Report is to supplement his Initial Report and update his opinions because, since the time of the report, "additional information has become available." (Dkt. 44-9 ¶ 1.0.)  In the Supplemental Report, Dr. Fishkind: (1) corrected his value per bed to $214,992, from $236,998 in the Initial Report, based on "a coding error that Dr. Durham identified" (Dkt. 44-9 ¶¶ 3.0, 10.0); (2) corrected the Initial Report's failure to deduct Plaintiff's net proceeds from Plaintiff's sale of the Property (Dkt. 44-9 ¶¶ 4.0, 10.0); (3) rebuts Dr. Durham's criticism of the Initial Report's damages calculation (of multiplying the number of licensed beds by the market rate per bed), by stating that it is an "industry" standard to "value facilities on the basis of licensed beds" (Dkt. 44-9 ¶ 9.0); and (4) rebuts Dr. Durham's opinion (See Dkt. 53 at 4) that Dr. Fishkind did not give proper consideration to Dr. Fishkind's use of comparable facilities that have outpatient services (Dkt. 44-9 ¶¶ 5.0–8.00).

As to his rebuttal of Dr. Durham's opinion regarding the comparable facilities having outpatient services, Dr. Fishkind defended his use of the comparable facilities, opining that "the market places little value on outpatient facilities" and residential treatment facilities are more valuable.  (Dkt. 44-9 ¶¶ 5.0–6.0.)  Dr. Fishkind based this conclusion on his consultation with treatment providers "[o]ver the last five years," who informed him that "outpatient services are generally only marginally profitable" and the deposition testimony of Jackie Krone, taken July 22,

2016, in which Ms. Krone testified that insurance companies provide higher reimbursements for residential treatment facilities than outpatient services.  (Dkt. 44-9 ¶¶ 7.0–8.0.)

At the hearing, Defendant's counsel stated that Dr. Fishkind did not supplement his responses to Defendant's July 22, 2016, subpoena *duces tecum* to Dr. Fishkind when Plaintiff served Dr. Fishkind's Supplemental Report.  In response, Plaintiff's counsel stated that they provided documents related to the Supplemental Report, specifically the deposition transcript of Ms. Krone.

Defendant moves to strike the Supplemental Report and exclude the testimony of Dr. Fishkind.  (Dkt. 44 at 1.)  Defendant contends that the Supplemental Report is not "supplemental" because it advances a new methodology for calculating damages and was untimely because "Dr. Fishkind had all the information available to him at the time he prepared his initial opinion."  (Dkt. 44 ¶¶ 1–2, 13, 14, 29.)  Further, Defendant contends that portions of the Supplemental Report rebut Dr. Durham's opinions, which is an untimely rebuttal because the deadline for rebuttal reports was June 30, 2016.  (Dkt. 44 ¶ 15.)  This rebuttal, Defendant contends, also offers new opinions regarding "insurance reimbursement, the prevalence of [residential treatment facilities] over outpatient facilities in Florida, and the profitability of residential (high) versus outpatient (low) services in Florida" and introduces new research upon which these new opinions rely.  (Dkt. 44 ¶ 15.)

At the hearing, Defendant presented argument about the prejudice it would suffer if the Supplemental Report is not stricken.  Specially, Defendant contends that discovery would need to be re-opened so that Defendant could (1) depose Dr. Fishkind and any witnesses identified by Dr. Fishkind in the Supplement Report as providing him information supporting his opinion, (2) review the facts and data upon which Dr. Fishkind relied in forming his opinions, and (3) engage

an expert to prepare a rebuttal report, which would necessitate making the rebuttal expert available for deposition.  Further, Defendant argues that the dispositive and *Daubert* motions filed in this case would need to be re-filed.

In response, Plaintiff contends that Dr. Fishkind's supplemental report was timely because it was made before the deadline for pretrial disclosures (*See* Fed. R. Civ. P. 26(e)(2) and (a)(3)(B) and Dkt. 25) and before the close of discovery.  (Dkt. 53 at 10–11.)  The cases Defendant cites, Plaintiff argues, are inapposite because they "pertain to situations where the supplementation occurred after the discovery deadline had passed."  (Dkt. 53 at 10–11.)

Further, Plaintiff argues that Dr. Fishkind prepared the supplemental report to rebut the testimony of Dr. Durham at his August 23, 2016 deposition, at which, Plaintiff contends, Dr. Durham offered new opinions not contained in his report—specifically opinions regarding the Initial Report's failure to address how the facilities identified as comparable to Plaintiff's proposed facility were in fact comparable in light of them having outpatient facilities, which Plaintiff's proposed facility would not have had.  (Dkt. 53 at 8–9, 11.)  Therefore, Plaintiff disputes Defendant's claim that the Supplemental Report presents new opinions because Plaintiff contends that it simply rebuts Dr. Durham's "new" opinions made during his deposition.  (Dkt. 53 at 9, 14–15.)  Also, Plaintiff contends that it offered to make Dr. Fishkind available after serving his Supplemental Report, but Defendant declined to depose him.  (Dkt. 53 at 9.)

Finally, Plaintiff argues that it was obligated to supplement Dr. Fishkind's report in order to correct errors Dr. Fishkind made in his Initial Report, which Dr. Durham pointed out.  (Dkt. 53 at 13.)  Dr. Fishkind would have corrected these errors earlier, Plaintiff contends, at his July 27, 2016 deposition, but Defendant canceled the deposition.  (Dkt. 53 at 13.)  Also, Defendant cannot claim surprise by these corrections, Plaintiff argues, because Dr. Durham identified the errors and

Defendant is not prejudiced because the corrections reduce Plaintiff's damages claim by over a million dollars.  (Dkt. 53 at 13–14.)

**B.      Discussion**

Reviewing the Supplemental Report, paragraph 3.0 corrects Dr. Fishkind's error in his Initial Report, which Dr. Durham identified in his report (Dkt. 53 2 at 3, n.2), of including in his calculation a facility that Dr. Fishkind stated was not in fact a comparable facility and thus should not be included in the calculation (Dkt. 44-1 ¶ 30.0).  This adjustment is reflected in paragraph 10.0 of the Supplemental Report.  (Dkt. 44-9 ¶ 10.)  Paragraph 4.0 of the Supplemental Report corrects the Initial Report's failure to deduct Plaintiff's net proceeds from the sale of the Property from Dr. Fishkind's damages, which was also noted by Dr. Durham (See Dkt. 53-2 at 3).  (Dkt. 44-9 ¶ 4.0.)  Dr. Fishkind reflected this adjustment in his damages conclusion in paragraph 10.0 of the Supplemental Report.  (Dkt. 44-9 ¶ 10.0.)

Although, as Defendant contends, Dr. Fishkind's corrections are based on information available to him at the time of his Initial Report, Rule 26(e)(1)(A) required Dr. Fishkind to correct his Initial Report.  *Tampa Bay Water*, 2011 WL 3475548, at *4–5; *Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 3102225, at *6 (explaining that supplementing a report to correct inaccuracies is permissible).  These corrections did not advance a new theory of damages, but instead corrected Dr. Fishkind's calculation under the method of calculating damages he espoused in his Initial Report.  Accordingly, the Motion to Strike Report is denied as to paragraphs 1.0 through 4.0 and 10.0 of the Supplemental Report.

In part C of his Supplemental Report, which is paragraphs 5.0 through 9.0, Dr. Fishkind addresses Dr. Durham's opinion that the Initial Report "did not give proper consideration to the fact that some of the comparable sales included both [residential] and outpatient activities."  (Dkt.

44-9 ¶ 5.0.)  In paragraphs 5.0 and 6.0 of the Supplemental Report, Dr. Fishkind presents opinions that outpatient facilities are not as valuable in the marketplace as residential treatment facilities because residential facilities are "relatively rare compared to outpatient facilities."  (Dkt. 44-9 ¶¶ 5.0–6.0.)  In Paragraphs 7.0 and 8.0 of the Supplemental Report, Dr. Fishkind states treatment providers he has consulted "[o]ver the last five years" inform him that residential treatment facilities yield higher insurance coverage or incidences of self-payment and that "outpatient services are generally only marginally profitable," which Ms. Krone's testimony also reflected. (Dkt. 44-9 ¶¶ 7.0–8.0.)  Finally, in paragraph 9.0 of the Supplemental Report, Dr. Fishkind rebuts Dr. Durham's report's questioning of the Initial Report's methodology by stating that it is the "industry" standard to value facilities by the number of licensed beds.  (Dkt. 44-9 ¶ 9.0.)

The Court concludes that paragraphs 5.0 through 9.0 of the Supplemental Report are untimely rebuttal opinions.  Dr. Durham served his report on June 16, 2016.  (Dkt. 53-2.)  As part of his report, Dr. Durham noted that all of the facilities Dr. Fishkind identified as comparable facilities, in performing his damages calculation, had outpatient services and thus, the company acquiring those facilities acquired "substantially more than" the "beds," which was the basis of Dr. Fishkind's measure.  (Dkt. 53-2 at 4.)  Thus, Dr. Durham concluded that, because of the presence of outpatient services, among other factors, there was "insufficient evidence to conclude" that the comparable facilities identified in the Initial Report were in fact comparable to Plaintiff's proposed facility.  (Dkt. 53-2 at 4.)  Further, Dr. Durham called into question the Initial Report's use of the measure of multiplying the number of beds by a market average as the damages calculation because it "explicitly assumes that any and every facility with x beds is worth $236,998 times x." (Dkt. 53-2 at 4.)

Under the Amended Case Management and Scheduling Order, Plaintiff's deadline to serve a rebuttal report was June 30, 2016.  (Dkt. 25.)  Rule 26(a)(2)(D) requires that disclosures relating to expert testimony must be made "at the times and in the sequence that the court orders."  Fed. R. Civ. P. 26(a)(2)(D).  Here, Dr. Fishkind had nearly two weeks after receiving Dr. Durham's report to serve a rebuttal report.  However, instead of serving a rebuttal report by the deadline or seeking an extension of the deadline, Plaintiff served the Supplemental Report on the last day of discovery.  Accordingly, these rebuttal opinions were untimely because they were not made by Plaintiff's June 30, 2016 deadline.

Because Plaintiff failed to provide the rebuttal opinions in accordance with Rule 26(a), the Court must next determine whether Plaintiff's failure was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1).  Plaintiff argues that its delay in serving the rebuttal report until August 29, 2016 was because Dr. Durham, during his August 23, 2016 deposition, provided new opinions that Dr. Fishkind rebutted in his Supplemental Report.  (Dkt. 53 at 14) (citing *Marco Island Cable, Inc. v. Comcast Cablevision of the S., Inc.*, No. 2:04CV26FTM29DNF, 2006 WL 1722341, at *1 (M.D. Fla. June 22, 2006) (denying a motion to strike a rebuttal report served after the deadline for rebuttal because the report rebutted testimony given by the opposing party's expert after the deadline for rebuttal reports)).  Specifically, Plaintiff contends that Dr. Durham testified that the Initial Report failed to explain how the facilities Dr. Fishkind identified as comparable could in fact be comparable because they offered outpatient services.  (Dkt. 53 at 14).

 Plaintiff's argument is unavailing because a review of Dr. Durham's testimony (Dkt 53-3) and Dr. Durham's report (Dkt. 53-2) shows that Dr. Durham testified about information contained in his report and did not offer new opinions at the deposition.  Specifically, Dr. Durham's report called into question Dr. Fishkind's identification of facilities as comparable that offered

outpatient services.  (Dkt. 53-2 at 4.)  During his deposition, Dr. Durham reiterated his report's position that Dr. Fishkind's Initial Report did not properly address this factor in identifying comparable facilities and thus did not offer new opinions.  (See Dkt. 53-3 at 88.)  Accordingly, because Dr. Durham's opinions that Dr. Fishkind rebuts in his Supplement Report were contained in Dr. Durham's June 16, 2016 report, and not, as Plaintiff contends, raised for the first time during Dr. Durham's August 23, 2016 deposition, there is no substantial justification for Plaintiff's failure to serve the rebuttal report by the June 30, 2016 deadline.

Plaintiff's failure to meet the rebuttal report deadline is also not harmless because Plaintiff served the rebuttal report on the last day of discovery.  Thus, as Defendant argues, Defendant cannot depose Dr. Fishkind regarding these opinions or engage in discovery regarding the facts and data Dr. Fishkind identified as underlying his rebuttal opinions in paragraphs 6.0 and 7.0 of the Supplemental Report.  For example, Defendant cannot depose the "treatment providers" Dr. Fishkind states he consulted with in forming his opinions in paragraph 7.0 of the Supplemental Report.  Accordingly, because Plaintiff failed to provide information as required by Rule 26(a)(2)(D), namely Plaintiff failed to timely serve rebuttal opinions, Plaintiff is "not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial."  Fed. R. Civ. P. 37(c)(1).  Therefore, the Motion to Strike Report is granted as to paragraphs 5.0 through 9.0 of the Supplemental Report.

## II.  Motion to Strike Damages

### A.  Background

On September 11, 2015, Plaintiff served its initial Rule 26(a)(1) disclosures, in which it disclosed, pursuant to Rule 26(a)(1)(A)(iii), a computation of each category of damages it claimed as follows:

- **Expenses Related to City's Conduct** – Lincoln Rock is claiming that the City's conduct caused Lincoln Rock to lose its investment in the business. Documents evidencing the expenses incurred to date will be produced to the City.

- **Loss of Property Value/Profits**: Lincoln Rock is claiming that the City's conduct caused the property's value to be lower than it would have been had the City acted according to the law, and that the City's conduct likewise caused Lincoln Rock to lose profits that would have been enjoyed but for the City's conduct. An expert is computing this category of damages, which will be disclosed at that time set forth in the case management order.

("Initial Damages Disclosure") (Dkt. 41-3.)

On June 21, 2016, during the deposition of Plaintiff's sole member, Mr. Rock, Plaintiff's counsel told Defendant's counsel that Plaintiff's damages claim was the damages claimed in Plaintiff's expert's report. (Dkt. 41 ¶¶ 7, 10; Dkt. 41-8.) Then, on July 21, 2016, during the deposition of one of Plaintiff's attorneys, Plaintiff's counsel told Defendant's counsel that it would not be seeking Plaintiff's attorneys' fees as damages. (Dkt. 41-9, 50-7.)

On August 2, 2016, Defendant served notice of a videotaped deposition *duces tecum*, to take place on August 22, 2016, of Plaintiff's corporate representative having knowledge of, among other things:

The identity, duties, function, contract terms and compensation of all subcontractors and other persons with whom [Plaintiff] contracted to provide services to [Plaintiff] or its clients from the date of incorporation to present.

All expenses incurred by [Plaintiff].

Damages alleged to have been suffered by [Plaintiff] as a result of the actions by the City as alleged in the Complaint.

(Dkt. 50-2.) Further, the corporate representative was instructed to produce at the deposition "[a]ll records showing [Plaintiff's] expenses," "[c]opies of all documents supporting, demonstrating or substantiating [Plaintiff's] allegation that [Plaintiff] has suffered damages as a result of the actions of the City as alleged in the Complaint," and "[t]o the extent that such documents are not described in the prior requests to produce, copies of all documents supporting, demonstrating or

substantiating your claim that you have suffered damages as result of the actions of the City as described in the Complaint." (Dkt. 50-2.) On August 19, 2016, however, Defendant served a notice of canceling the deposition of Plaintiff's corporate representative. (Dkt. 50-8.)

On August 17, 2016, before the August 29, 2016, close of discovery, Plaintiff served supplemental Rule 26(a) disclosures regarding damages, disclosing as follows:

> Damages: In addition to the damages set forth in Dr. Fishkind's previously-served expert report, Plaintiff will also be seeking as damages the following items at trial:
>
> 1.  Consulting expenses for Dr. Eric Kaplan, Jacki Krone, and Althea Greco, in the amount of $120,000. These amounts and the services rendered by these consultants have been previously testified to at deposition by these individuals, as well as by Bernard Rock and Tom Lamb. Similarly, the supporting documentation for these paid expenses has previously been produced.
>
> 2.  Expenses for Hill Ward Henderson to prosecute special use application and subsequent pre-litigation efforts to obtain approval by City of Tampa: $32,174. Attached hereto are Hill Ward's bills showing amounts for services rendered in this regard. Mr. John Grandoff may testify about these amounts and their reasonableness. Messrs. Rock and Lamb may also testify about these amounts and that they were paid.

("Supplemental Damages Disclosure") (Dkt. 41-1.) Plaintiff attached invoices of Mr. Grandoff's firm to Mr. Rock to Supplemental Damages Disclosure. (Dkt. 41-1.)

In the Motion to Strike Damages, Defendant contends that Plaintiff's Supplemental Damages Disclosure should be stricken as untimely because Plaintiff failed to (1) disclose these alleged damages at the time of the Initial Damages Disclosure even though Plaintiff possessed the billing records attached to the Supplemental Damages Disclosure and (2) update the Initial Damages Disclosure in a timely manner and only did so shortly before the close of discovery. (Dkt. 41 ¶ 26.) Further, Defendant argues that the untimely disclosure is prejudicial to Defendant because the parties have completed "the depositions of the six witnesses Plaintiff identifies as having knowledge of these damages" and that, at the time of the depositions, Defendant did not

question these witnesses about their invoices to Plaintiff because Defendant relied on Plaintiff's counsel's representation that Plaintiff did not seek such damages. (Dkt. 41 ¶ 27.) At this juncture, Defendant contends, it is unable to procure expert testimony to rebut this damages claim. (Dkt. 41 ¶ 27.)

In response, Plaintiff contends that its Initial Damages Disclosure encompassed the damages disclosed in the Supplemental Damages Disclosure because the Initial Damages Disclosure included "Documents evidencing the expenses incurred to date will be produced to the City." (Dkt. 50 at 3, 8.) Further, Plaintiff argues, without citation to authority, that its Supplemental Damages Disclosure was timely because it was made before the close of discovery. (Dkt. 50 at 1, 7, 8.) Finally, Plaintiff contends that it served the Supplemental Damages Disclosure five days before Defendant's deposition of Plaintiff's corporate representative on damages and, because Defendant canceled the deposition, any prejudice Defendant experienced was caused by Defendant's canceling the deposition. (Dkt. 50 at 2, 7.) To the extent the Court finds its supplemental disclosures untimely, Plaintiff argues that the Court should re-open discovery to ameliorate any prejudice to Defendant. (Dkt. 50 at 10.)

With regard to Defendant's contention that Plaintiff did not produce documents evidencing Plaintiff's expenses (Dkt. 41 ¶ 13), Plaintiff contends that it produced the supporting documents prior to the depositions of the consultants and attorneys. (Dkt. 50 at 4–5.) Specifically, as to the consulting expenses disclosed in the Supplemental Damages Disclosure, Plaintiff contends that "[a]s discovery progressed, [Plaintiff] timely produced documents evidencing the expenses incurred in seeking local and state permits and approvals, including invoices and other documents showing payments relating to the consulting services of Dr. Eric Kaplan, Jacki Krone, and Althea Greco." (Dkt. 50 at 4–5.) At the hearing, Plaintiff stated that production regarding the consulting

fees was made to Defendant in May 2016.  Further, Plaintiff contends that Defendant deposed Dr. Kaplan, Ms. Krone, Ms. Greco, and Plaintiff's principal, Mr. Rock, in June and July 2016 "on these issues" and that "documents pertaining to the consulting work of Kaplan, Krone, and Greco were produced before they were deposed."  (Dkt. 50 at 5; Dkts. 50-4–50-6.)  Thus, Plaintiff contends, contrary to Defendant's argument, Defendant "has known literally for months through the document productions and the above depositions that these consultants were collectively paid $120,000 for their services" and Defendant had the opportunity to depose them.  (Dkt. 50 at 5.)  As to the attorneys' fees disclosed in the Supplemental Damages Disclosure, Mr. Grandoff was deposed on July 21, 2016 (Dkt. 41-9), and Plaintiff contends that, before his deposition, Plaintiff produced copies of Mr. Grandoff's law firm's bills, although they were redacted, including as to the specific dollar charges.  (Dkt. 41-9; Dkt. 50 at 5.)

In contrast, Defendant contends that Plaintiff's Supplemental Damages Disclosure, made on August 17, 2016, after the depositions of Mr. Kaplan, Ms. Krone, Ms. Greco, and Mr. Grandoff, "the witnesses with knowledge of these issues," is prejudicial to Defendant because Defendant is now "precluded . . . from conducting any defense of over $150,000 the Plaintiff now seeks from [Defendant.]"  (Dkt. 41 ¶¶ 14, 17.)  Further, Defendant argues that allowing the Supplemental Damages Disclosure would be prejudicial based on Plaintiff's counsel's representations as to the damages Plaintiff sought.  (Dkt. 41 ¶¶ 10–11.)  Specifically, Defendant points to Plaintiff's counsel's representation, made on June 21, 2016, during the deposition of Plaintiff's sole member, Mr. Rock, that Plaintiff's damages claim was the damages claimed in Plaintiff's expert's report, which, Defendant contends was devoid of "any analysis of the expenses incurred by Plaintiff in this project."  (Dkt. 41 ¶¶ 7, 10; Dkt. 41-8.)  Then, during Mr. Grandoff's July 21, 2016 deposition, Defendant's counsel referred to the billing records and stated, "I have not seen any demand for

reimbursement of his fees in this case . . . are you trying to make a claim for his fees?"  (Dkt. 41-9.)  Plaintiff's counsel replied, "Not at this point. If we are, I will let you know, but I don't -- I don't think that's the horse we are riding."  (Dkt. 41-9.)  After Defendant's counsel noted that Mr. Grandoff's billing records were redacted, Plaintiff's counsel stated, "If we -- if we are -- if we decide we are going to move -- add those as damages, you will get a copy that actually has the number in it, but I don't anticipate doing that."  (Dkt. 50-7.)

**B.    Discussion**

The Court must first determine whether, according to Plaintiff's contention (Dkt. 50 at 3–4, 7), Plaintiff's Initial Damages Disclosure encompassed its claim for consulting and attorneys' fees disclosed in Plaintiff's Supplemental Damages Disclosure.   Plaintiff's Initial Damages Disclosure disclosed "Expenses Related to the City's Conduct" as a category of damages, in which it stated that Plaintiff "is claiming that the [Defendant's] conduct caused Lincoln Rock to lose its investment in the business," and that "[d]ocuments evidencing the expenses incurred to date will be produced."  (Dkt. 41-1).  While this is a broad description of a category of damages, Plaintiff's argument that its Initial Damages Disclosure encompassed a claim for Plaintiff's attorneys' and consultants' fees is undermined by Plaintiff's counsel's representations to Defendant's counsel regarding the type of damages Plaintiff seeks.  First, on June 21, 2016, during the deposition of Plaintiff's sole member, Mr. Rock, Plaintiff's counsel stated, "The damages that are being sought are what's in the [Fishkind] report."  (Dkt. 41-8.)  Then, on July 21, 2016, during the deposition of Mr. Grandoff, Plaintiff's counsel stated that Plaintiff would not be seeking Mr. Grandoff's fees as damages.  (Dkts. 41-9, 50-7.)  Thus, while Plaintiff's Initial Damages Disclosure used broad language that could encompass its claims for attorneys' and consultants' fees disclosed in its Supplemental Damages Disclosures, Plaintiff made representations to Defendant's counsel that it

would not seek such expenses as damages (Dkts. 41-8, 41-9, 50-7), which affected Defendant's discovery strategy. Accordingly, Plaintiff's argument is undermined by its representations through counsel that it would not be seeking its expenses as damages.

The Court must next determine whether Plaintiff's Supplemental Damages Disclosure constitutes a timely supplement under Rule 26(e). Rule 26(e) requires a party to supplement or correct disclosures made under Rule 26 in a "timely manner" when the party "learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Here, the invoices supporting Plaintiff's Supplemental Damages Disclosure for Mr. Grandoff's fees are from 2013 and early 2014 (Dkt. 41-1), more than a year before suit was filed and Plaintiff's Initial Damages Disclosure was due. Further, Plaintiff's claim for the fees of its consultants would likewise pre-date the lawsuit because these consultants were hired to assist Plaintiff in obtaining the special use permit (Dkt. 50 at 2), which, according to the Complaint, occurred in 2012 or early 2013. (Dkt. 1 ¶¶ 11–19.)

Rule 26(a)(1)(E) requires a party to make its *initial* disclosures "based on the information then reasonably available to it" and "[a] party is not excused from making its disclosures because it has not fully investigated the case." Fed. R. Civ. P. 26(a)(1)(E). Here, the invoices supporting Plaintiff's Supplemental Damages Disclosure were available to Plaintiff at the time of its Initial Damages Disclosure, but Plaintiff did not disclose them at that time. Thereafter, Plaintiff failed to supplement its Initial Damages Disclosure until nearly a year after the Initial Damages Disclosure was served and less than two weeks before the close of discovery. The Court holds that Plaintiff's notifying Defendant of its intention to seek its attorneys' and consultants' fees, of over $150,000

(Dkt. 41-1), two weeks before the close of discovery, despite having the information available to it since before the time its Initial Damages Disclosure was served, was untimely.  *See Caruana v. Marcum*, No. 3:01-CV-1567, 2016 WL 4060691, at *3 (M.D. Tenn. July 28, 2016) (internal quotations omitted) ("Rule 26(e) does not give license to sandbag one's opponent with new information that should have been disclosed earlier.").

Further, Plaintiff's failure to timely supplement its Initial Damages Disclosure is not excused, under Rule 26(e)(1)(A), because "the additional or corrective information [was] otherwise [ ] made known to the other parties during the discovery process."  Fed. R. Civ. P. 26(e)(1)(A).  Although Plaintiff contends that it produced the materials evidencing the consultants' fees in May 2016, Plaintiff did not disclose to Defendant that these expenses would be sought as damages until August 2016.  Further, although redacted versions of Mr. Grandoff's invoices were produced in advance of his July 21, 2016, deposition, the un-redacted invoices, showing the amounts billed, were not disclosed until they were attached to the Supplemental Damages Disclosure.  (Dkt. 41-1.)  Thus, although Plaintiff produced materials supporting the damages claim for Plaintiff's attorneys' and consultants' fees prior to Plaintiff's serving the Supplemental Damages Disclosure, Plaintiff did not notify Defendant of its intention to seek these expenses as damages until the Supplemental Damages Disclosure and, on two occasions, represented to Defendant that it would not be seeking these expenses as damages.  *See Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1222 (11th Cir. 2010) (rejecting plaintiff's argument that its claim for loss of goodwill damages was "'otherwise . . . made known'" to defendant, asserting that it was encompassed in its initial damages disclosure that claimed damages for an alleged lost sale, because "[a]lthough there may be evidentiary overlap between the alleged lost sale and a claim of loss of goodwill, considerable differences exist between the two theories" and thus, " [t]he district

court did not abuse its broad discretion in rebuffing [plaintiff's] belated effort to introduce a new category of damages"); *Goodman-Gable-Gould Co. v. Tiara Condo. Ass'n, Inc.*, 595 F.3d 1203, 1211–13 (11th Cir. 2010) (affirming the district court's exclusion of evidence relating to appellee's theory of damages based on the appellee's "discovery violations" because it failed to supplement answers to interrogatories regarding its damages theories and its supplemental responses "reveal[ed] no indication that [appellee] had abandoned the price gouging theory in favor of the misrepresentation and delay theories"); *Johnson v. R.J. Reynolds Tobacco Co.*, No. 2:12-CV-618-FTM-29, 2013 WL 1899737, at *1, n.1 (M.D. Fla. May 7, 2013) (reasoning that "Plaintiff's revelation to Defendant of the amount of damages he seeks, through mediation or otherwise, does not alleviate Plaintiff's duty to supplement his initial disclosures pursuant to Rule 26(e)").

Finally, the Court must determine, under Rule 37(c)(1), whether Plaintiff's failure to abide Rule 26(e)(1) "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Factors to be considered are "the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the opposing party if the information had been admitted." *Lips*, 350 F. App'x at 340. In *Mee Industries v. Dow Chemical Company*, the Eleventh Circuit upheld the district court's exclusion of evidence relating to the plaintiff's theory of damages, for loss of goodwill, that was not disclosed until it was included by plaintiff in the joint pretrial statement. 608 F.3d at 1221. There, plaintiff's initial disclosures did not include a claim for loss of goodwill damages. *Id.* Then, in response to an interrogatory asking plaintiff to identify any other claims for damages, plaintiff again failed to identify loss of goodwill as a category of damages. *Id.* Only in the parties' joint pretrial statement did plaintiff identify loss of goodwill as a category of damages. *Id.* The Eleventh Circuit determined that "[t]he district court did not abuse its discretion in concluding disclosure was required under Rule 26 and that [plaintiff's] failure to

meet the Rule 26 requirements was not substantially justified or harmless." *Id.* at 1221–22. Elaborating, the Eleventh Circuit held that "[t]he district court did not abuse its broad discretion in rebuffing [plaintiff's] belated effort to introduce a new category of damages, especially in light of its failure to ever present the required computation of alleged good will damages and the complexity of the financial calculations that would have required expert testimony" and that failing to provide a damages calculation was not harmless because such computation would "involve complex financial calculations." *Id.* at 1222.   As analyzed earlier, the materials supporting Plaintiff's Supplemental Damages Disclosure were available to Plaintiff at the time of its Initial Damages Disclosure.   Plaintiff provides no reason for this delay in disclosure, other than that Plaintiff did not elect to seek these damages until the time it served the Supplemental Damages Disclosure.  (Dkt. 50 at 5–6.)  Therefore, Plaintiff's delay, until August 2016, less than two weeks before the close of discovery, in disclosing this category of damages was not substantially justified.

Further, the Court finds that permitting the Supplemental Damages Disclosure is harmful and prejudicial to Defendant.  Specifically, as Defendant contends, the depositions of the witnesses with knowledge of the invoices—Dr. Kaplan, Ms. Krone, Ms. Greco, Mr. Rock, and Mr. Grandoff—were completed at least a month before the Supplemental Damages Disclosure was served and, based on Plaintiff's counsel's representations as to its theory of damages, Defendant "did not inquire in detail or seek relevant discovery of the six witnesses above listed by Plaintiff with knowledge of these expenses."  (Dkt. 41 ¶¶14, 17, 27.)  Further, Defendant contends, "[h]ad the fees been properly disclosed, Defendant would likely have engaged an expert or experts to analyze the reasonableness and necessity of both the consulting and attorneys' fees."  (Dkt. 41 ¶ 17.)

However, Plaintiff's contention that this Court can ameliorate any prejudice to Defendant by permitting Defendant additional discovery regarding the Supplemental Damages Disclosure (Dkt. 50 at 10) is well-taken.  Specifically, the trial term for this case has been extended from December 2016 until January 2017.  (Dkts. 25, 62.)  Considering the extended time before trial together with the facts that (1) the language of Plaintiff's Initial Damages Disclosure was broad and arguably encompassed the damages sought in the Supplemental Damages Disclosure, (2) Plaintiff served the Supplemental Damages Disclosure (albeit shortly) before the close of discovery, and (3) Plaintiff had produced many of the materials supporting its Supplemental Damages Disclosure earlier in discovery, a limited reopening of discovery is warranted.  *See Engle v. Taco Bell of Am., Inc.*, No. 8:09-CV-2102-T-33TBM, 2011 WL 883639, at *2 (M.D. Fla. Mar. 14, 2011) (declining to strike a party's untimely-disclosed experts because "in the interest of fairness . . . the Court reopens discovery for the limited purpose of allowing [plaintiffs] to depose both experts prior to trial" as "[t]he reopening of discovery cures any prejudice that [plaintiffs] may have sustained due to untimely disclosures").  Accordingly, the Motion to Strike Damages is denied, but discovery is reopened for the limited purpose of allowing Defendant to take discovery regarding the Supplemental Damages Disclosure.

## III.    Motion to Compel

### A.    Background

In the Motion to Compel, Plaintiff seeks to compel better answers from Defendant in response to Plaintiff's interrogatory to Defendant, which requests information regarding whether members of the City Council who voted on the Application "have any formal education in the field of land use and zoning," and, if so, information regarding degrees obtained by the City Council members.  (Dkt. 39-2.)  In response to the interrogatory, Defendant raised numerous objections, including that the interrogatory seeks irrelevant information, the interrogatory's use of "formal

education" is vague, and Defendant does not have knowledge of the information requested sufficient to make an affirmation.  (Dkt. 39-2.)

Plaintiff contends that Defendant's experts at the first two levels of review of the Application recommended that the Application be approved as "consistent with the applicable comprehensive plan and zoning criteria."  (Dkt. 39 at 4.)  However, Plaintiff contends, the City Council denied the Application "on its own accord, more or less ignoring the advice of its own experts."  (Dkt. 39 at 5.)  Discovery of the City Council members' education in land use and zoning is necessary, Plaintiff argues, to determine "whether the City councilpersons have any formal education in zoning or land use which they relied upon when they rejected the findings of City staff." (Dkt. 39 at 5.)  This information is relevant to the allegations in the Complaint, Plaintiff contends, because "a city's decision to disregard the findings of its own zoning staff can provide evidence of discriminatory intent, particularly when, as here, the plaintiff proffers evidence of discriminatory animus on the part of neighborhood opposition."  (Dkt. 39 at 4) (citing *Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 507 (9th Cir. 2016) ("A city's decision to disregard the zoning advice of its own experts can provide evidence of discriminatory intent, particularly when, as here, that recommendation is consonant with the municipality's general zoning requirements and plaintiffs proffer additional evidence of animus.").

In response, Defendant first argues that the discovery sought by the interrogatory is duplicative as to three City Council members because Plaintiff has deposed Charles Miranda, Lisa Monetelione, and Michael Suarez, during which Plaintiff inquired of their formal training and education in land use planning.  (Dkt. 43 ¶¶ 3–8.)  Next, Defendant argues that it does not maintain the records Plaintiff seeks because the requirement to be a City Council member is to be a Tampa resident.  (Dkt. 43 ¶ 10.)  Thus, Defendant does not have records of City Council members'

education or training other than what the members themselves make public on the City Council's website.  (Dkt. 43 ¶ 10.)  Defendant contends that it is not required to engage in extensive research to answer this interrogatory and should not be required to seek the discovery that Plaintiff failed to undertake as to the City Council members Plaintiff did not depose.  (Dkt. 43 ¶¶ 11–13) (citing *Miller v. Pruneda*, 236 F.R.D. 277, 282 (N.D.W. Va. 2004) ("A party answering interrogatories is required to provide information that is available to it and can be produced without undue labor and expense . . . Interrogatories cannot require the responding party to make extensive investigations or conduct complex research.")).

Finally, Defendant argues that the discovery is not relevant because Plaintiff misunderstands and misconstrues the layers of review preceding the City Council's decision on an application.  (Dkt. 43 ¶¶ 14–20.)  Specifically, the layers of review preceding the City Council's decision involve an objective comparison of an application to the requirements of the city code whereas the City Council makes a subjective decision, after a public hearing, about the compatibility of the application's proposed use with the surrounding neighborhood.  (Dkt. 43 ¶ 15.)  Thus, the City Council members' land use and zoning experience is irrelevant to Plaintiff's claims because the "City Council is not engaged in the practice of land planning or zoning," rather it "applies the framework of the law to the evidence it hears at the hearing."  (Dkt. 43 ¶ 17.)

**B.      Discussion**

Rule 33(b)(1)(B) requires the officer or agent of a governmental agency to "furnish the information available to the party."  Fed. R. Civ. P. 33(b)(1)(B); *Miller*, 236 F.R.D. at 282.  When answering an interrogatory, "[t]he answering party cannot limit his answers to matters solely within his personal knowledge and ignore information immediately available to him or under his control" and, "the answering party is required to give the information known to him personally, or through his attorney, investigators, or other agents or representative employed by him."  *Aiges v.*

*Ironshore Specialty Ins. Co.*, No. 15-CV-61300, 2015 WL 12564324, at *1–*2 (S.D. Fla. Dec. 9, 2015) (finding an answer to an interrogatory in which the party deferred to its hired professionals and experts deficient because the party "must give the information known to him personally, or through his attorney, investigators or other agents or representative employed by him"); *Essex Builders Grp., Inc. v. Amerisure Ins. Co.*, 230 F.R.D. 682, 684–85 (M.D. Fla. 2005) (finding that an assignee of an insurance claim's response to an interrogatory that the assignor had the information sought was deficient and ordering the assignee to "make an effort to interview those witnesses and obtain the requested information").  When the answering party "lacks necessary information to make a full, fair and specific answer to an interrogatory, then it should say so under oath and explain the efforts made to obtain the information."  *Aiges*, 2015 WL 12564324, at *1.

However, as Defendant contends, "[d]iscovery does not mean that a party should have to prepare the other party's case" and "[a] responding party is generally not required to perform extensive research to acquire requested information."  *L.H. v. Schwarzenegger*, No. CIV S06-2042 LKK GGH, 2007 WL 2781132, at *2 (E.D. Cal. Sept. 21, 2007).  The Court must view the discovery request in "the context of Fed.R.Civ.P. 26(b) which generally instructs that the amount of discovery requested must be balanced by the need for such discovery."  *Id.* (emphasis in original) ("A party must make *reasonable* efforts to respond, and reasonableness is determined by the size and complexity of the case and the resources that a responding party has available to put to the case.").

Here, Defendant filed the affidavit of Kimberley Marple, Defendant's Employee Relations Specialist Supervisor, who maintains the personnel files for Defendant's employees, including City Council members.  (Dkt. 43-4 ¶¶ 2–3.)  Ms. Marple avers that City Council members, as elected officials, "do not submit resumes, curricula vitae, employment history or verification of

education" to Defendant.  (Dkt. 43-4 ¶¶ 4–5.)  Thus, she avers, Defendant "does not possess or maintain records regarding 'formal education in the field of land use and zoning' for its City Council members."  (Dkt. 43-4 ¶ 6.)  Defendant argues that obtaining this information from its Council members would be burdensome because it would require Defendant to interview the members, "track down a former member," and inquire about their educational backgrounds.  (Dkt. 43 ¶ 12.)

The Court finds that the interrogatory seeks information relevant to Plaintiff's allegations in the Complaint regarding the City Council's role in reviewing and voting on the Application and Defendant's affirmative defenses that its actions, through its City Council, were in good faith, based upon competent, substantial evidence and legitimate, non-discriminatory reasoning.  (Dkts. 1, 15.)  However, the Court finds that Defendant has met its burden under Rule 33 in responding to Plaintiff's interrogatory.   Defendant's agent avers that Defendant does not possess the information sought by the interrogatory.  (Dkt. 43-4.)  Plaintiff deposed three City Council members and obtained information from them responsive to the interrogatory.  Plaintiff did not, however, seek to depose the remaining City Council members.  Although Defendant could obtain the information from the City Council members, the Court recognizes that Defendant is not required prepare Plaintiff's case.  *Schwarzenegger*, 2007 WL 2781132, at *2.  Therefore, the Motion to Compel is denied.

Accordingly, it is

**ORDERED**:

1.     Plaintiff's Motion to Compel Better Answers to Interrogatories (Dkt. 39) is **DENIED**.

2.      Defendant's Motion to Strike and Preclude Plaintiff's Damage Claims Not Previously or Properly Disclosed (Dkt. 41) is **DENIED**, but discovery is reopened for the limited purpose of permitting Defendant to take discovery related to the Supplemental Damages Disclosure (Dkt. 41-1).  Defendant may conduct such limited discovery until December 30, 2016.

3.      Defendant's Motion to Strike Plaintiff's Supplemental Rule 26 Disclosure and Exclude Supplemental Report and Testimony of Henry H. Fishkind, Ph.D. (Dkt. 44) is **GRANTED** in part, as to paragraphs 5.0 through 9.0 of the Supplemental Report (Dkt. 44-9), and **DENIED** in part, as to paragraphs 1.0 through 4.0 and 10.0 of the Supplemental Report (Dkt. 44-9).

**DONE** and **ORDERED** in Tampa, Florida on October 21, 2016.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record