**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

LINCOLN ROCK, LLC, a Florida
Limited Liability Company,

    Plaintiff,

v.                                          Case No: 8:15-cv-1374-T-30JSS

CITY OF TAMPA, a Florida
municipal corporation,

    Defendant.

## ORDER

THIS CAUSE comes before the Court upon Plaintiff's Motion to Exclude or Limit the Opinions of Ulrey, Glass, and Durham (Dkt. 46) and Defendant's Response in Opposition (Dkt. 55). The Court, upon review of the motion, response, and being otherwise advised in the premises, concludes that the motion should be granted in part and denied in part.

## BACKGROUND

This is an action by Plaintiff Lincoln Rock, LLC against Defendant City of Tampa for alleged violations of the Fair Housing Act ("FHA") and the Americans with Disabilities Act ("ADA") arising from the City's denial of Lincoln Rock's request for a SU-II permit to allow Lincoln Rock to operate a Residential Treatment Facility ("RTF") in a west Tampa neighborhood for persons recovering from alcohol and drug addiction.

Lincoln Rock is a Florida limited liability company that was formed in 2012, and has one member, Bernard Rock. Lincoln Rock was formed for the purpose of establishing a RTF within the City of Tampa to treat those addicted to alcohol or controlled substances. In 2012, Lincoln Rock purchased property that was located in a City of Tampa mixed-use neighborhood with surrounding residential, commercial, and social/club uses (the "Property").

Lincoln Rock purchased the Property with the intention of opening and operating a state licensed RTF for recovering addicts. The Property is zoned RO-1. The Tampa City Code provides that certain land uses in the City are not allowed in the RO-1 zoning district. Other uses not allowed as a matter of right may be allowed upon approval of a SU-II permit by the Tampa City Council; these uses include a RTF.

The Tampa City Code vests the sole authority to approve or deny a SU-II permit with the City Council: "The city council shall be solely responsible for decisions on all applications for S-2 special use permits." The process of obtaining a SU-II permit includes meeting with professional staff at the City; submitting an application to the City; undergoing review by the City's Development Review Committee ("DRC"); presenting evidence at a public hearing before the City Council; and obtaining approval for the SU-II permit from the City Council.

At the public hearing for a SU-II permit before the City Council, the burden is on the landowner to bring forth sufficient evidence to establish that the proposed use meets

the requirements for the use under the Tampa City Code: "It shall be the responsibility of the applicant to present evidence in the form of testimony, exhibits, documents, models, plans and the like to support the application for approval of a special use permit."

If the DRC determines that a landowner's proposal meets the objective criterial, the DRC issues a determination that the proposed use is consistent with the criteria. Following the DRC's review, the City Council holds a public hearing on the application for a SU-II permit. The City Council is required to apply the criteria in Sec. 27-129, Tampa City Code, to determine whether the proposed use ensures the public health, safety and general welfare; the use is compatible with the Comprehensive Plan; and the use is compatible with the surrounding neighborhood.

Lincoln Rock needed to obtain a SU-II permit to operate the RTF on the Property. On February 25, 2013, Lincoln Rock applied for the special use permit with the City. The application sought approval to operate a twenty-one bed RTF. The residents who would have lived at the RTF could not be active in their addiction; rather, they must have been seeking treatment to cure their disease. Such individuals would live together as a group while simultaneously receiving treatment (such as group and individual counseling). This housing arrangement would provide the residents with a therapeutic benefit.

Upon receipt of Lincoln Rock's application, the City's planning and zoning staff reviewed it for completeness. The DRC determined that the proposal met the objective

3

criteria of Sec. 27-132, Tampa City Code. The application was thereafter brought before the City Council for a public hearing. On June 13, 2013, the City Council heard the application. At the public hearing, the members of the City Council expressed a number of concerns regarding the public health, safety and welfare; with compatibility with the Comprehensive Plan; and with compatibility with the surrounding neighborhood. In addition, a number of neighbors expressed concerns. In a vote of six to one, the City Council denied Lincoln Rock's application for the SU-II permit.

Lincoln Rock sold the Property. According to Lincoln Rock, after taking into account all of its expenses of approximately $1.1 million, it lost money, and did not realize the value of the Property as entitled for residential drug and alcohol treatment.

Lincoln Rock claims that the City's denial of its application for the SU-II permit was based on discriminatory reasons. Lincoln Rock contends that the neighborhood opposition to Lincoln Rock's application was almost entirely premised on discriminatory reasons, i.e., that Lincoln Rock's drug-addicted clients would be a danger to the elderly and children in the neighborhood and would cause crime to increase, and that the City adopted these discriminatory views when it denied the application.

The City has listed Mary Lynn Ulrey, Dr. George Glass, Dr. Stephen Durham, and Lee Pallardy as its experts in this case. Lincoln Rock moves to exclude the opinions of Ulrey and Glass in their entirety. Lincoln Rock also moves to limit Durham's opinion.

4

As explained below, Lincoln Rock's motion is granted with respect to Ulrey and denied with respect to Glass and Durham.

## **STANDARD**

In federal court, expert opinions must meet the admissibility guidelines announced by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Under Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Before permitting expert opinion testimony, the court must make certain that the expert employs "in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). The court must act as gatekeeper to prevent speculative and unreliable "expert" testimony from reaching the jury. *See Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005) (noting that the "task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under *Daubert*"). The gatekeeping role is "significant" because an "expert's opinion 'can be both powerful and quite misleading.'" *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert,* 509 U.S. at 595).

As gatekeeper, the court makes three inquiries: (1) first, whether the expert is qualified to testify competently regarding the matters that he intends to address; (2) second, whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) third, whether the testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562-63 (11th Cir. 1998); *see also Cooper v. Marten Transp., Ltd.,* 539 F. App'x 963, 965-67 (11th Cir. 2013). The party offering the expert opinion testimony bears the burden of establishing, by a preponderance of the evidence, the expert's qualification, reliability, and helpfulness. *See Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002)); *see also Sumner v. Biomet, Inc.,* 434 F. App'x 834, 841 (11th Cir. 2011); *Frazier,* 387 F.3d at 1260.

Importantly, although rulings on admissibility under *Daubert* inherently require the court to conduct an exacting analysis of the proffered expert's methodology, it is not the court's role to make ultimate conclusions as to the persuasiveness of the proffered evidence. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003). Indeed, the gatekeeper role is not intended to supplant the adversary system or the role of the jury. *See id.* "Vigorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; *see also U.S. v. Ala. Power Co.,* 730 F.3d 1278, 1282-85 (11th Cir. 2013) (explaining that the *Daubert* inquiry "is not intended to supplant" cross-examination and presentation of contrary evidence); *Costa v. Wyeth, Inc.,* No. 8:04-cv-2599-T-27MAP, 2012 WL 1069189, at *2 (M.D. Fla. Mar. 29, 2012).

## DISCUSSION

### I.     Mary Lynn Ulrey, MS, ARNP

Since 2002, Mary Lynn Ulrey, MS, ARNP has been the Chief Executive Officer of Drug Abuse Coordinating Office, Inc. ("DACCO").  DACCO is a non-profit entity providing residential and outpatient substance abuse treatment to more than 25,000 people annually through 50 programs and 10 service sites.  DACCO is the largest substance abuse treatment center in the Tampa Bay area.

Ulrey was involved in the process of planning and obtaining approval from the Tampa City Council for a SU-II permit to operate the DACCO Center for Behavioral Health (the "Center") located in Tampa, Florida.  The SU-II permit was unanimously approved by the Tampa City Council and the Center has been operating since 2002 as an 81-bed in-patient residential alcohol and drug treatment facility.

Ulrey's opinion largely discusses the extensive planning and significant work she performed to obtain the SU-II permit.  For example, she describes how she personally met

with the neighborhood associations that would be affected by the proposed RTF, consulted with local community leaders, and brought people recovering from alcohol and drug addition to testify at the City Council hearing.

Ulrey's opinion also discusses the requirements to operate a successful RTF, such as having a "plan for security," "regular service providers to meet the needs of the patients," "a minimum number of employees," appropriate storage for medications, and transportation to take patients to outside appointments. (Dkt. 46-14).

Ulrey opines that a RTF of the size that Lincoln Rock proposed should be able to anticipate and handle breach of security issues, regular medical emergencies, patients leaving the facility against medical advice, traffic and parking issues, and evacuation planning in the event of a Level 3 or above hurricane.

Ulrey states that, in order to operate a successful RTF, experience in treating co-occurring disorders requires psychiatry and addiction training. DACCO has 2 board-certified addiction medicine physicians on staff.

Ulrey concludes that: "The City Council, in my opinion, was not provided with enough information concerning the policies, procedures, and operation of the Lincoln Park facility to justify granting an operating permit." *Id.*

Lincoln Rock argues that Ulrey's opinion would not be helpful to the jury because it is "legally irrelevant." (Dkt. 46). Lincoln Rock also contends that Ulrey's past

8

experience at other locations working with neighborhood organizations is not a recognized expert "methodology" that is reliable or helpful in this case.

The City counters that Ulrey's testimony, which is rooted in extensive experience and training, supports the City's position that it was the lack of preparation, the failure to reach out to the neighbors and community leaders, the vagueness and inadequacy of the proposal presented, and the failure to engage consultants/employees with any experience in the RTF industry that resulted in the denial of the SU-II permit. In other words, the City contends that Ulrey's opinion shows that the City's denial of the SU-II permit was based on non-discriminatory reasons.

The Court concludes that Ulrey's expert opinion should be entirely excluded because Ulrey has no first-hand knowledge as to what prompted the City's denial of Lincoln Rock's request for a SU-II permit. Whether Ulrey was successful in the past in connection with an application for another facility in another neighborhood is simply not relevant to the City's consideration of Lincoln Rock's application. Ulrey can only speculate, based on her past experiences—this speculation, however, is not sufficiently reliable. Moreover, whether Lincoln Rock provided sufficient information to the City regarding land use planning is outside the scope of Ulrey's expertise. Ulrey admits that she has no special training or knowledge in land use planning, zoning, local government affairs, or traffic engineering.

It is worth noting that, to the extent the City wants to point out that it has approved RTF's in the past under circumstances where the City was provided with more information, the City can provide its own lay witness on this issue. In other words, there is no need to present purported "expert" testimony to counter Lincoln Rock's allegations that the City's denial of the SU-II permit was discriminatory—any member from the City Council can testify as to what non-discriminatory reasons motivated his/her vote. Ulrey's testimony on this issue is simply not relevant to the legal issues in this case and, as a result, would not assist the trier of fact. Accordingly, Lincoln Rock's motion is granted to the extent that the Court excludes Ulrey's expert testimony in this case.

## II.  George S. Glass, M.D.

George S. Glass, M.D. has worked in the field of alcohol and drug addiction treatment for more than forty years and has treated more than 40,000 patients with alcohol and drug addiction issues. He graduated from Northwestern University Medical School and Yale University and is double board-certified by the American Board of Psychiatry and Neurology and the American Medical Society on Addiction Medicine. He has served as the Medical Director for the Programs for Alcoholism Counseling Treatment, the Managing Partner for Psychiatry and Substance Abuse Services of Pasadena, the Program Director for the Alcoholism Treatment Program at the University of Texas Medical School, and the Program Director for the Alcoholism Rehabilitation Unit at Bethesda Naval Hospital. He has, among other things, owned, operated, and

worked in numerous Residential Treatment Centers throughout his more than forty years of practice.

Dr. Glass opines on the protocols necessary to develop a successful residential treatment program. According to the City, Dr. Glass's testimony is in rebuttal to Lincoln Rock's expert, Eric Kaplan, M.D. Dr. Glass offers opinions on the impact a RTF has on a residential neighborhood from the perspective of a medical professional. He also opines on what is required to achieve financial viability for a RTF. He also offers testimony on the significant amount of outside services and traffic flow that a RTF generates. Dr. Glass discusses the necessity for crises management protocols, detailed protocols for admission, and detailed arrangements to transfer unsuitable patients to psychiatric facilities. He also offers opinions regarding the unsuitability of Lincoln Rock's facility to house 21 patients, the effect of such a high patient census, and the resulting impact on the neighborhood.

Dr. Glass opines, in relevant part:

> Realistically it takes a long time to build a good facility with a good reputation, and high-level, high-functioning professionals are not going to spend a significant amount of money and take their one chance at treatment and recovery on a start-up facility like Lincoln Rock, absent some incredibly appealing physical attributes and a treatment program that is highly effective and respected. The materials I reviewed reflected neither.

(Dkt. 46-16 at 25).

Lincoln Rock moves to exclude Dr. Glass's entire expert testimony. Lincoln Rock argues, in a conclusory fashion, that Dr. Glass's opinion that Lincoln Rock's business plan would have failed would not be helpful to the jury because it is not relevant to Lincoln Rock's "damages approach" in this case. (Dkt. 46).

The City counters that Dr. Glass rebuts Dr. Kaplan's expert testimony on the issue of what is necessary to run a successful RTF and rebuts Lincoln Rock's alleged damages of over three-million dollars.

The Court will not exclude Dr. Glass at this time. As the City points out, Dr. Glass appears to be offered mainly in rebuttal to Lincoln Rock's experts. Accordingly, it is premature to exclude his testimony at this stage. Lincoln Rock cannot have its cake and eat it too. If Lincoln Rock chooses to introduce testimony about how Lincoln Rock was going to be a highly successful RTF, Lincoln Rock opens the door to Glass's opinions on the minimum requirements necessary to operate a viable RTF and how Lincoln Rock failed to meet these requirements. Accordingly, Lincoln Rock's motion is denied with respect to Dr. Glass.

### III.   Stephen E. Durham, PHD

Lincoln Rock moves to exclude the opinion of economist Stephen E. Durham, PhD, but only to the extent that Dr. Durham adopted the opinion of the City's expert property appraiser Lee F. Pallardy, III, MAI, that the difference in the value of the Property with or without a SU-II permit is $90,000. Lincoln Rock does not otherwise

challenge the qualifications, methodology, or opinions of Dr. Durham and Lincoln Rock does not challenge Mr. Pallardy's opinion.

The Court has reviewed Dr. Durham's opinion and concludes that Lincoln Rock's motion should be denied. Dr. Durham analyzed the methodology employed by Plaintiff's economist Dr. Fishkind and concluded that it was unreliable. Specifically, Dr. Durham noted that there were three methodologies available to calculate Lincoln Rock's damages: lost profits, comparable sales, and valuation of the permit itself. Like Dr. Fishkind, he rejected the first (lost profits) approach as speculative because Lincoln Rock's proposed RTF never opened and Lincoln Rock lacked experience operating a RTF.

Next, Dr. Durham analyzed the comparable sales approach utilized by Dr. Fishkind. Dr. Durham opined in detail on the factors that rendered Dr. Fishkind's approach unreliable and speculative. Dr. Durham concluded that the only reliable measure of damages in this case was to value the SU-II permit itself. Because Dr. Durham is not a property appraiser, he relied on the opinion of Pallardy to inform his opinion on the value of the SU-II permit. Dr. Durham's reliance on this amount is perfectly reasonable in light of his conclusion that the valuation of the permit itself is the best measure of Lincoln Rock's damage. Lincoln Rock's arguments to the contrary are without merit. Accordingly, Lincoln Rock's motion is denied with respect to Durham.

It is therefore ORDERED and ADJUDGED that Plaintiff's Motion to Exclude or Limit the Opinions of Ulrey, Glass, and Durham (Dkt. 46) is granted in part and denied in part for the reasons explained herein.

DONE and ORDERED in Tampa, Florida on November 9, 2016.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record