# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

LINCOLN ROCK, LLC, a Florida
Limited Liability Company,

      Plaintiff,

v.                                  Case No: 8:15-cv-1374-T-30JSS

CITY OF TAMPA, a Florida
municipal corporation,

      Defendant.

_____

## ORDER

THIS CAUSE comes before the Court upon Defendant's *Daubert* Motion to Exclude Opinion Testimony of Plaintiff's Economic Expert Henry H. Fishkind, Ph.D. (Dkt. 49), Plaintiff's Response in Opposition thereto (Dkt. 58), Defendant's Motion to Strike and Exclude Declaration of Henry H. Fishkind, Ph.D. (Dkt. 64), and Plaintiff's Response in Opposition thereto (Dkt. 73).   The Court, upon review of the motions, responses, the record evidence in support of same, and, being otherwise advised in the premises, concludes that Defendant's motions should be granted.  As explained further below, the Court excludes the expert testimony of Dr. Fishkind because it is unreliable under *Daubert* and would not assist the trier of fact in this case.

## BACKGROUND

This is an action by Plaintiff Lincoln Rock, LLC against Defendant City of Tampa for alleged violations of the Fair Housing Act ("FHA") and the Americans with

Disabilities Act ("ADA") arising from the City's denial of Lincoln Rock's request for a SU-II permit to allow Lincoln Rock to operate a Residential Treatment Facility ("RTF") in a west Tampa neighborhood for persons recovering from alcohol and drug addiction.

Lincoln Rock is a Florida limited liability company that was formed in 2012, and has one member, Bernard Rock. Lincoln Rock was formed for the purpose of establishing a RTF within the City of Tampa to treat those addicted to alcohol or controlled substances. In 2012, Lincoln Rock purchased property that was located in a City of Tampa mixed-use neighborhood with surrounding residential, commercial, and social/club uses (the "Property").

Lincoln Rock purchased the Property with the intention of opening and operating a state licensed RTF for recovering addicts. The Property was improved with a residential structure that had multiple, self-contained units that could be made available to individuals seeking housing during the course of their treatment. Lincoln Rock had no prior experience operating a RTF. The Property is zoned RO-1. The Tampa City Code provides that certain land uses in the City are not allowed in the RO-1 zoning district. Other uses not allowed as a matter of right may be allowed upon approval of a SU-II permit by the Tampa City Council; these uses include a RTF.

The Tampa City Code vests the sole authority to approve or deny a SU-II permit with the City Council: "The city council shall be solely responsible for decisions on all applications for S-2 special use permits." The process of obtaining a SU-II permit

2

includes meeting with professional staff at the City; submitting an application to the City; undergoing review by the City's Development Review Committee ("DRC"); presenting evidence at a public hearing before the City Council; and obtaining approval for the SU-II permit from the City Council.

At the public hearing for a SU-II permit before the City Council, the burden is on the landowner to bring forth sufficient evidence to establish that the proposed use meets the requirements for the use under the Tampa City Code: "It shall be the responsibility of the applicant to present evidence in the form of testimony, exhibits, documents, models, plans and the like to support the application for approval of a special use permit."

Lincoln Rock needed to obtain a SU-II permit to operate the RTF on the Property. On February 25, 2013, Lincoln Rock applied for the special use permit with the City. The application sought approval to operate a twenty-one bed RTF.  The residents who would have lived at the RTF could not be active in their addiction; rather, they must have been seeking treatment to cure their disease.  Such individuals would live together as a group while simultaneously receiving treatment (such as group and individual counseling).

Upon receipt of Lincoln Rock's application, the City's planning and zoning staff reviewed it for completeness.  The DRC determined that the proposal met the objective criteria of Sec. 27-132, Tampa City Code.  The application was thereafter brought before the City Council for a public hearing.  On June 13, 2013, the City Council heard the

application.   At the public hearing, some members of the City Council expressed concerns regarding the public health, safety and welfare; with compatibility with the Comprehensive Plan; and with compatibility with the surrounding neighborhood.   In addition, a number of neighbors expressed concerns.   In a vote of six to one, the City Council denied Lincoln Rock's application for the SU-II permit.

Lincoln Rock sold the Property.   According to Lincoln Rock, the sales price was less than the price would have been as a residential drug and alcohol treatment facility.

Lincoln Rock claims that the City's denial of its application for the SU-II permit was based on discriminatory reasons.   Lincoln Rock contends that the neighborhood opposition to Lincoln Rock's application was almost entirely premised on discriminatory reasons, i.e., that Lincoln Rock's drug-addicted clients would be a danger to the elderly and children in the neighborhood and would cause crime to increase, and that the City adopted these discriminatory views when it denied the application.

Lincoln Rock has listed Henry H. Fishkind, Ph.D. as its damages' expert in this case.   The City moves to exclude Dr. Fishkind's opinion in its entirety.   The City also moves to strike Dr. Fishkind's Declaration, filed in support of Lincoln Rock's response in opposition to the City's motion to exclude Dr. Fishkind.   As explained further below, the Court grants the City's motions.   To understand the Court's reasoning, it is necessary to first provide an overview of the events that have occurred in this case with respect to the filing of Dr. Fishkind's initial expert report, supplemental report, and declaration, and

4

address the City's motion to strike.  The Court will then analyze Dr. Fishkind's expert opinion in detail under *Daubert* to explain why his opinion is too unreliable to pass muster in this case.

### DR. FISHKIND'S INITIAL AND SUPPLEMENTAL OPINIONS[1]

On September 4, 2015, the Court entered a Case Management and Scheduling Order, setting Plaintiff's deadline for expert disclosures as April 18, 2016, and Defendant's deadline for expert disclosures as May 2, 2016 (Dkt. 17).  On April 25, 2016, the Court, upon Defendant's motion, entered an Amended Case Management and Scheduling Order, extending Defendant's expert disclosures deadline until June 16, 2016, and setting Plaintiff's expert rebuttal disclosure deadline for June 30, 2016 (Dkt. 25).  The discovery deadline was August 29, 2016, and the deadline for dispositive and *Daubert* motions was September 23, 2016 (Dkt. 30).

Plaintiff's expert, Henry Fishkind, Ph.D., prepared an expert report dated April 18, 2016 ("Initial Report") (Dkt. 44-1).  In the Initial Report, Dr. Fishkind gave the opinion that Plaintiff suffered nearly $5 million in damages.  Dr. Fishkind based this conclusion on his opinion that "Plaintiff reasonably expected to have 21 licensed beds" at the residential treatment facility it sought to establish on the Property.  (Dkt. 44-1 ¶ 18.0).  Because the sales of comparable facilities, which are "often purchased on the basis of the

---

[1] A large portion of this section is taken directly from the Magistrate Judge's Order on the City's motion to strike Dr. Fishkind's supplemental report.  (Dkt. 63).

number of licensed beds," yielded $236,998 per bed, Dr. Fishkind concluded that Plaintiff suffered damages in the amount of $4,976,956.  (Dkt. 44-1 ¶ 18.0).  Dr. Fishkind stated that, because he could not measure it to a reasonable degree of economic certainty, he "decided not to quantify the Plaintiff's damages based on the potential profitability of the [residential treatment facility] as the Plaintiff had planned" and, instead, "valued the damages based on the market value of the licensed beds that the Plaintiff reasonably expected to be approved."  (Dkt. 44-1 ¶ 24.0).

On June 16, 2016, Defendant served its Rule 26(a)(2) expert disclosures, disclosing Stephen E. Durham, Ph.D. as its expert and attaching Dr. Durham's written report.  (Dkt. 53-2).  In his report, Dr. Durham concluded that Plaintiff suffered economic damages totaling $90,000, assuming wrongdoing by Defendant.  (Dkt. 53-2).  Dr. Durham based this conclusion on the difference in value of the Property with and without a special use permit.  (Dkt. 53-2 at 2).  Dr. Durham's report addressed Dr. Fishkind's report, noting, among other things, (1) in reaching his average cost per bed, Dr. Fishkind included a facility in the United Kingdom in the calculus despite Dr. Fishkind stating that this facility should not be considered as a comparable facility (See Dkt. 44-1 ¶ 30.0); (2) that Dr. Fishkind failed to account for the $1,000,000 Plaintiff received from the sale of the Property in his damages; and (3) Dr. Fishkind's comparable facilities offered outpatient services, unlike Plaintiff's proposed facility, thus challenging the appropriateness of their use as comparable facilities.  (Dkt. 53-2 at 3-4).

6

On August 29, 2016, which was the discovery deadline, Plaintiff served a supplemental Rule 26 disclosure, attaching a supplemental expert report by Dr. Fishkind, dated August 29, 2016 ("Supplemental Report").   (Dkt. 44-9).   In the Supplemental Report, Dr. Fishkind stated that the purpose of the Supplemental Report was to supplement his Initial Report and update his opinions because, since the time of the report, "additional information has become available."   (Dkt. 44-9 ¶ 1.0).   In the Supplemental Report, Dr. Fishkind: (1) corrected his value per bed to $214,992, from $236,998 in the Initial Report, based on "a coding error that Dr. Durham identified" (Dkt. 44-9 ¶¶ 3.0, 10.0); (2) corrected the Initial Report's failure to deduct Plaintiff's net proceeds from Plaintiff's sale of the Property (Dkt. 44-9 ¶¶ 4.0, 10.0); (3) rebutted Dr. Durham's criticism of the Initial Report's damages calculation (of multiplying the number of licensed beds by the market rate per bed), by stating that it is an "industry" standard to "value facilities on the basis of licensed beds" (Dkt. 44-9 ¶ 9.0); and (4) rebutted Dr. Durham's opinion (See Dkt. 53 at 4) that Dr. Fishkind did not give proper consideration to the use of comparable facilities that have outpatient services (Dkt. 44-9 ¶¶ 5.0-8.0).

As to his rebuttal of Dr. Durham's opinion regarding the comparable facilities having outpatient services, Dr. Fishkind defended his use of the comparable facilities, opining that "the market places little value on outpatient facilities" and residential treatment facilities are more valuable.   (Dkt. 44-9 ¶¶ 5.0-6.0).   Dr. Fishkind based this

conclusion on his consultation with treatment providers "[o]ver the last five years," who informed him that "outpatient services are generally only marginally profitable" and the deposition testimony of Jackie Krone, taken on July 22, 2016, in which Ms. Krone testified that insurance companies provide higher reimbursements for residential treatment facilities than outpatient services.  (Dkt. 44-9 ¶¶ 7.0-8.0).

The City moved to strike the Supplemental Report and argued that the Supplemental Report was not "supplemental" because it advanced a new methodology for calculating damages and was untimely because "Dr. Fishkind had all the information available to him at the time he prepared his initial opinion."  (Dkt. 44 ¶¶ 1-2, 13, 14, 29). Further, Defendant contended that portions of the Supplemental Report rebutted Dr. Durham's opinions, which was an untimely rebuttal because the deadline for rebuttal reports was June 30, 2016.  (Dkt. 44 ¶ 15).  This rebuttal, Defendant argued, also offered new opinions regarding "insurance reimbursement, the prevalence of [residential treatment facilities] over outpatient facilities in Florida, and the profitability of residential (high) versus outpatient (low) services in Florida" and introduced new research upon which these new opinions relied.  (Dkt. 44 ¶ 15).

The Magistrate Judge granted the City's motion to strike in part.  The Magistrate Judge allowed Dr. Fishkind to supplement his Initial Report only to the extent that (1) he had made an error when calculating the cost-per-bed by including a facility that was not comparable to Lincoln Rock and (2) he was allowed to correct another error, which was

the failure to deduct the net proceeds from the sale of the Lincoln Rock property from the damages calculations.  The Magistrate Judge reasoned that: "These corrections did not advance a new theory of damages, but instead corrected Dr. Fishkind's calculation under the method of calculating damages he espoused in his Initial Report."  (Dkt. 63).

The Magistrate Judge struck five paragraphs of the Supplemental Report as untimely rebuttal.  Specifically, the Magistrate Judge ruled as follows:

> In part C of his Supplemental Report, which is paragraphs 5.0 through 9.0, Dr. Fishkind addresses Dr. Durham's opinion that the Initial Report "did not give proper consideration to the fact that some of the comparable sales included both [residential] and outpatient activities." (Dkt. 44-9 ¶ 5.0.) In paragraphs 5.0 and 6.0 of the Supplemental Report, Dr. Fishkind presents opinions that outpatient facilities are not as valuable in the marketplace as residential treatment facilities because residential facilities are "relatively rare compared to outpatient facilities." (Dkt. 44-9 ¶¶ 5.0-6.0.) In Paragraphs 7.0 and 8.0 of the Supplemental Report, Dr. Fishkind states treatment providers he has consulted "[o]ver the last five years" inform him that residential treatment facilities yield higher insurance coverage or incidences of self-payment and that "outpatient services are generally only marginally profitable," which Ms. Krone's testimony also reflected. (Dkt. 44-9 ¶¶ 7.0-8.0.) Finally, in paragraph 9.0 of the Supplemental Report, Dr. Fishkind rebuts Dr. Durham's report's questioning of the Initial Report's methodology by stating that it is the "industry" standard to value facilities by the number of licensed beds. (Dkt. 44-9 ¶ 9.0.)
>
> The Court concludes that paragraphs 5.0 through 9.0 of the Supplemental Report are untimely rebuttal opinions.

(Dkt. 63).  The Magistrate Judge also concluded that the City was unfairly prejudiced by the untimely rebuttal opinions and therefore Lincoln Rock was "not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial."  *Id.*

Subsequently, and in response to the City's *Daubert* motion to exclude Dr. Fishkind, Lincoln Rock offered Dr. Fishkind's Declaration.  The City argues, in its motion to strike, that this constitutes an untimely third expert opinion, which greatly prejudices the City because this case is on the eve of trial.  The Court agrees and turns to this issue next.

## MOTION TO STRIKE DR. FISHKIND'S DECLARATION

### I.      Standard

An expert report may be supplemented, pursuant to Rule 26(e), when the party learns that the original disclosure was incomplete or incorrect, but may not be supplemented in order to cure a major omission or to remedy an expert's inadequate or incomplete preparation.  *See Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *2 (M.D. Fla. Apr. 27, 2009); *see, e.g., Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F. Supp. 2d 1241, 1248-52 (M.D. Fla. 2012) (excluding expert's second report, served on the last day of discovery, which included opinions regarding claims that were not addressed in the initial report); *K & H Dev. Grp., Inc. v. Howard*, 255 F.R.D. 562, 567-68 (N.D. Fla. 2009) (striking an expert's "supplemental" report that included a new theory of damages, which was based on information that was available when the expert prepared his initial report).

Rule 26(e) "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the

initial report." *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225, at *6 (S.D. Fla. June 2, 2016) (internal quotations omitted).  Rule 26(e) "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy." *Cochran v. Brinkmann Corp.*, No. 1:08-cv-1790-WSD, 2009 WL 4823858, at *5 (N.D. Ga. Dec. 9, 2009).  "Rather, Rule 26 imposes a duty on parties to comply with the disclosure deadlines.  It grants them no right to produce information in a belated fashion." *Mobile Shelter*, 845 F. Supp. 2d at 1250 (internal citations and quotations omitted). "Courts have broad discretion to exclude untimely-disclosed expert witness testimony—even when they are designated as 'supplemental' reports...[c]onsequently, a party cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness report." *Companhia*, 2016 WL 3102225, at *5-*6 (striking an expert's declaration filed in defense of a *Daubert* motion seeking to exclude him because the declaration was a "late supplemental expert report" and "contains additional opinions and explanations for his opinions that are the 'hallmark of expert evidence,' which should have been disclosed in his original reports.") (quoting *Cooper v. S. Co.*, 390 F.3d 695, 728 (11th Cir. 2004)); *see also Thames v. City of Pensacola*, No. 303-CV-586, 2005 WL 1876175, at *5 (N.D. Fla. Aug. 1, 2005) (striking an expert affidavit filed in opposition to a motion for summary judgment where, after reviewing deposition testimony of another witness in the case, the expert modified his opinion).

## II.      Discussion

Dr. Fishkind's Declaration attempts to rebut nearly every argument made by the City in its *Daubert* motion seeking to exclude him.  The Declaration contains new opinions, opinions previously struck by the Magistrate Judge, and untimely rebuttal.  For example, Dr. Fishkind's Initial Report referenced his selection of Acadia's U.S. acquisitions of RTFs based only on the fact that the acquisitions had 100-beds or fewer.  He used no other criterion for inclusion in this subset.  The Initial Report is silent as to any investigation or analysis of the specifics of the RTFs that comprised this 100-bed or fewer subset.  His Declaration, however, offers new opinions based on new research and analysis:

> I reviewed information on Acadia's web site about the residential treatment facilities acquired by Acadia to determine that they were not unusually grandiose in comparison to Lincoln Rock's proposed facility.
>
> . . .
>
> . . . to select the proper set of data necessary to support estimating the value of Lincoln Rock's RTF via the market approach to value requires expert study, analysis, and judgment.  It is far more than a simple exercise in arithmetic.  Instead, I had to first (i) use my professional judgment to conduct research and obtain data on residential treatment facilities and the market value for their beds; (ii) analyze and review this data to identify information that should be excluded or included; (iii) review the data to insure comparability to Lincoln Rock; and (iv) determine an appropriate and sufficiently large sample size that could reliably be the basis of the mathematical calculation.  There was nothing random or arbitrary about this process, as the City falsely contends.

(Dkt. 58-1 ¶¶ 13, 14).

Dr. Fishkind's Declaration further opines that:

> there is no basis for assuming that per bed value is directly correlated with the number of beds in a facility.  Thus, it was appropriate for me to include facilities with beds under 100 to ensure: (a) appropriate comparability and (b) a sufficient sample size and to control for variability in per bed value at particular facilities across various locations.
>
> . . .
>
> The price per bed at residential treatment facilities is essentially a function of the following common characteristics: (a) a typical lengthy stay often lasting twenty-eight days; (b) generally paid for through insurance; and (c) predicated on the cost of room and board, therapy, and medical supervision where needed.  The latter are the cost components of essentially any residential treatment program, whether for treatment of residential drug and alcohol treatment, or other ailments.

(Dkt. 58-1 ¶¶ 15, 16).

As the City points out, Dr. Fishkind's Initial and Supplemental Reports did not offer any analysis, explanation, or opinion that the valuation of a RTF was somehow a function of factors other than the number of licensed beds.

In paragraph 19 of the Declaration, Dr. Fishkind discusses his opinion on the profitability of outpatient services, noting that they are "only marginally profitable," presumably in rebuttal of Dr. Durham's opinion that Dr. Fishkind's Initial Report failed to explain why the comparable facilities had outpatient services when Lincoln Rock planned on offering only inpatient services.  Notably, the Magistrate Judge already struck Dr. Fishkind's untimely rebuttal on this issue, so this portion of the Declaration is already excluded from this case.

13

The Court concludes that Dr. Fishkind's Declaration is an untimely supplemental report.  The Declaration adds additional layers of analysis, research, and background which were available to him at the time that he served his Initial Report.  As the Magistrate Judge previously concluded, any supplementation at this late stage is highly prejudicial to the City.  Moreover, the Court does not agree, as Lincoln Rock appears to contend, that an expert's declaration filed in response to a motion challenging that expert is somehow immune from being stricken merely because it was filed in response to a *Daubert* motion.  "It is hardly surprising that a party would seek to bolster its expert's opinions after a *Daubert* motion points out significant flaws."  *Companhia*, 2016 WL 3102225, at *9.  "A contrary rule would mean that the experienced expert could simply lie in wait so as to express his genuine opinions only after the opposing party discloses hers."  *Id.* (internal quotations and citations omitted).  The Court will not condone such a litigation strategy because doing so "would be to invite the proverbial fox into the henhouse."  *Id.* (citing *Keener v. United States*, 181 F.R.D. 639, 641 (D. Mont. 1998)).[2]

---

[2] It is also not relevant to the inquiry to consider the City's failure to depose Dr. Fishkind in this case as Lincoln Rock so vehemently points out.  The City made a strategic decision not to depose Dr. Fishkind, presumably because the City viewed his Initial Report as severely deficient under *Daubert* and thus subject to exclusion.  This strategy, on the City's part, did not prevent Lincoln Rock from submitting a rebuttal opinion or otherwise supplementing Dr. Fishkind's Initial Report earlier in this case, before the expiration of the relevant deadlines.  Lincoln Rock cannot, at this late hour, attempt to rehabilitate Dr. Fishkind simply because he was not deposed in this case.

14

Accordingly, the Court strikes Dr. Fishkind's Declaration.  The Court now turns to the City's *Daubert* motion to exclude the entirety of Dr. Fishkind's expert testimony in this case.

## *DAUBERT* MOTION TO EXCLUDE DR. FISHKIND

### I.    Standard

In federal court, expert opinions must meet the admissibility guidelines announced by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and Federal Rule of Evidence 702.  Under Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Before permitting expert opinion testimony, the court must make certain that the expert employs "in the courtroom the same level of intellectual rigor that characterizes the practice of the expert in the field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999).  The court must act as gatekeeper to prevent speculative and unreliable "expert" testimony from reaching the jury.  *See Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1291 (11th Cir. 2005) (noting that the "task of evaluating the reliability of expert testimony is

uniquely entrusted to the district court under *Daubert*").   The gatekeeping role is "significant" because an "expert's opinion 'can be both powerful and quite misleading.'" *U.S. v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert,* 509 U.S. at 595).

As gatekeeper, the court makes three inquiries: (1) first, whether the expert is qualified to testify competently regarding the matters that he intends to address; (2) second, whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) third, whether the testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *See City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562-63 (11th Cir. 1998); *see also Cooper v. Marten Transp., Ltd.,* 539 F. App'x 963, 965-67 (11th Cir. 2013).   The party offering the expert opinion testimony bears the burden of establishing, by a preponderance of the evidence, the expert's qualification, reliability, and helpfulness. *See Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir. 2002)); *see also Sumner v. Biomet, Inc.,* 434 F. App'x 834, 841 (11th Cir. 2011); *Frazier,* 387 F.3d at 1260.

Importantly, although rulings on admissibility under *Daubert* inherently require the court to conduct an exacting analysis of the proffered expert's methodology, it is not the court's role to make ultimate conclusions as to the persuasiveness of the proffered

evidence. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003). Indeed, the gatekeeper role is not intended to supplant the adversary system or the role of the jury. *See id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; *see also U.S. v. Ala. Power Co.,* 730 F.3d 1278, 1282-85 (11th Cir. 2013) (explaining that the *Daubert* inquiry "is not intended to supplant" cross-examination and presentation of contrary evidence); *Costa v. Wyeth, Inc.,* No. 8:04-cv-2599-T-27MAP, 2012 WL 1069189, at *2 (M.D. Fla. Mar. 29, 2012).

## II.   Discussion

As the Court noted above, Dr. Fishkind's Initial Report gave the opinion that Plaintiff suffered nearly $5 million in damages. He based this conclusion on his opinion that "Plaintiff reasonably expected to have 21 licensed beds" at the RTF it planned to establish on the Property. (Dkt. 44-1 ¶ 18.0). Because the sales of comparable facilities, which are "often purchased on the basis of the number of licensed beds," yielded $236,998 per bed, Dr. Fishkind concluded that Plaintiff suffered damages in the amount of $4,976,956. (Dkt. 44-1 ¶ 18.0).[3] Dr. Fishkind stated that, because he could not measure it to a reasonable degree of economic certainty, he "decided not to quantify the

---

[3] Dr. Fishkind lowered this amount in his Supplemental Report (Dkt. 49-2) to $3,557,674, which this Court accepts per the Magistrate Judge's prior Order on this issue, permitting him to correct certain errors contained in his Initial Report (Dkt. 63).

Plaintiff's damages based on the potential profitability of the [residential treatment facility] as the Plaintiff had planned" and, instead, "valued the damages based on the market value of the licensed beds that the Plaintiff reasonably expected to be approved." (Dkt. 44-1 ¶ 24.0).

The City argues that Dr. Fishkind's "comparable sales" approach is unreliable because it is based on a single criterion, i.e., the acquisition costs that a $4-billion-dollar international healthcare conglomerate, Acadia Healthcare, incurred for the purchase of U.S. residential treatment facilities with 100 beds or fewer from 2013-2015. The City argues that Dr. Fishkind arbitrarily selected this subset without including any factors that would assure that the RTFs in this subset demonstrated some reliable indicia of comparability with each other and with Lincoln Rock. The Court agrees.

The Initial Report contains no data point, research document, analysis, fact-finding, or investigation materials offered to support Dr. Fishkind's methodology of valuing Lincoln Rock based on Acadia's acquisition of RTFs in the United States that have 100-beds or fewer. As the City argues, this methodology is "akin to using the average price per room of all 100-room or fewer hotels to value a small Motel 6 facility by taking the average of the price per-room of The Ritz Carlton, the Hilton, and the Motel 6." (Dkt. 49). The Initial Report does not discuss factors like the underlying value of the real property, the location of the underlying real estate, the services offered by these facilities, whether the facilities were profitable and for how long, the daily rates charged

by these facilities versus the daily rates Lincoln Rock would be able to charge, and the length of time the facilities were in business.

To illustrate the unreliability of Dr. Fishkind's methodology, the comparator with the closest number of beds to Lincoln Rock's proposed RTF, Skyway, which had 28 beds, sold at a price of $10,714.00 per-bed.  Yet, Dr. Fishkind's methodology, as corrected in his Supplemental Report, is based on a value per-bed of $214,922.00.  Most of the RTFs included in his valuation are larger than twice the size of Lincoln Rock's proposed RTF. For instance, one of the comparators used by Dr. Fishkind is the 68-bed facility Pacific Grove Hospital in Riverside, California.  Pacific Grove is located on a 4.5-acre campus with three separate treatment units for medical detoxification, psychiatric services, and partial hospitalization.  It offers private courtyards, patient lounges, and semi-private rooms.  In comparison, Lincoln Rock's proposed RTF was to be located on 0.63-acres in West Tampa, in a 8,905-square-foot building, in which patients would be lodged three-to-a-room.  The price per-bed that Acadia Healthcare paid for Pacific Grove was $154,412.00, yet Dr. Fishkind opined the price per-bed for Lincoln Rock's proposed RTF would be $214,922.00.

As the City contends, for a methodology utilizing the average acquisition cost of comparators to be reliable, the methodology must include, at a minimum, more than just the single arbitrary criterion of RTFs with a certain number of beds.  The comparators should include RTFs of similar size with similar services and amenities offered, located in

a comparable geographic location, charging comparable fees and accepting comparable types of insurance, and demonstrating comparable future profit margin projections.

Dr. Fishkind's methodology also assumes that Lincoln Rock would have opened its doors, would have generated enough revenue to survive, would have achieved profitability, and would have been an appealing acquisition target for Acadia. Dr. Fishkind's only opinion on Lincoln Rock's purported profitability is that it "purchased the Property. This demonstrates the Plaintiff's capacity to finance the RTF." (Dkt. 49-1 ¶21). Although Lincoln Rock "had no experience operating an RTF," Dr. Fishkind noted that Lincoln Rock had developed a business plan, identified staff, who had developed operating manuals and protocols, and had assembled a professional team. (Dkt. 49-1 ¶¶ 22, 23). These conclusory observations, combined with the flawed price-per-bed methodology, are too speculative to support Dr. Fishkind's damage estimate of $3,557,674. In other words, Dr. Fishkind's testimony fails the reliability-prong of *Daubert*. Presenting the jury with Dr. Fishkind's flawed methodology would be inappropriate and highly misleading on the issue of Lincoln Rock's damages. As gatekeeper, the Court must exclude this testimony. Accordingly, the Court grants the City's *Daubert* motion to exclude Dr. Fishkind's testimony in this case.

It is therefore **ORDERED and ADJUDGED** that:

1.    Defendant's Motion to Strike and Exclude Declaration of Henry H. Fishkind, PhD (Dkt. 64) is granted.

2.      Defendant's *Daubert* Motion to Exclude Opinion Testimony of Plaintiff's

Economic Expert Henry H. Fishkind, PhD (Dkt. 49) is granted.

DONE and ORDERED in Tampa, Florida on November 18, 2016.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record